**In re The GUARDIANSHIP of June MIKULANEC.**

No. C3–83–1089.

Supreme Court of Minnesota.

Nov. 2, 1984.

### ORDER

Hubert H. Humphrey, III, Atty. Gen., John M. Burman, St. Paul, Thomas L. Johnson, Hennepin County Atty., Minneapolis, for appellant.

Douglas W. Thomson, St. Paul, for respondent.

YETKA, Justice.

June Mikulanec, committed as mentally ill and dangerous after being found not

guilty by reason of insanity of the brutal slaying of the wife of a man she delusionally thought was in love with her, now wishes to marry Herbert Ward, an anti-social personality and pedophile committed for his history of violently and sexually exploiting vulnerable women and children. Dr. Brian M. Gottlieb, the Medical Director at the Minnesota Security Hospital in St. Peter where both Mikulanec and Ward are committed and Mikulanec's treating psychiatrist, petitioned for the appointment of a guardian for Mikulanec. The. Hennepin County Probate Court denied the petition. Gottlieb appealed to this court and moved for an injunction preventing the marriage pending this appeal. The injunction was granted. We reverse the Hennepin County Probate Court and remand for the appointment of a conservator for Mikulanec.

On October 3, 1977, June Mikulanec stabbed Susan Rosenthal 97 times in a fit of jealousy. Mikulanec had known Al Rosenthal before he married Susan and had built a delusional world revolving around him. She believed he was in love with her. Her delusions reached the extent of preparing elaborate dinners, setting a luxurious table, waiting for Rosenthal to appear, and, when he did not, making excuses for his failure to come. When Rosenthal married, Mikulanec blamed Susan for coming between her and Rosenthal. In a violent expression of pent-up rage and anger, Mikulanec went to the Rosenthal house and brutally murdered Susan.

At the murder trial, the jury found Mikulanec had committed the murder, but was not guilty by reason of mental illness. She was committed on November 30, 1978. On September 20, 1982, after it became a co-educational facility, she was transferred to the Minnesota Security Hospital in St. Peter. It was there that she met Ward.

Herbert Ward was committed 8 years ago to the Security Hospital as a sexual offender. He has a history of illegal and inappropriate behavior, ranging from rape to child abuse. Typically, he preys on vulnerable women and children with sincere words and superficial tenderness and then physically and sexually abuses them. He had tried to convince at least one other vulnerable female patient to marry him in the year that the institution has been co-educational.

The trial court found that the petitioners for the guardianship had not met their burden to show with clear and convincing evidence that a guardianship was needed:

[T]he ward is oriented as to time and place, exercises reasonable control over her general affairs, including money and other property, and in other areas of personal management she acts reasonably. The various tests indicate that she has a reasonable degree of intelligence, is aware of her surroundings, that she is active in programs and activities in the hospital, exercises a degree of leadership and, in general, appears competent. Her problem is of a limited scope. in that she suffers from a mental disorder that causes her to react in stressful situations as described in the original Order of Commitment.

In the original Order of Commitment, Judge Peterson described Mikulanec's disorder with greater detail and more concern:

[S]he is delusional, distorts reality by misinterpretation and makes false assumptions contrary to fact; that she attempts to repress and suppress from her conscious awareness that she may be angry, explosive, manipulative, and a pathalogical [sic] liar, setting herself up as not being responsible for her own actions, claiming others are responsible and that she is the innocent victim rather than the aggressor; that she sets up pathalogical [sic] defenses, including massive denial, amnesia, projection, rationalization, repression, projective identification, primitive idealization, and the omnipotence which are being used to protect the psychological image of herself as being a perfect "Virgin Mary" type person; that when others do not respond as she wishes, she is likely to become enraged and lash out in an outburst of anger, during which time she may become engaged in violent behavior to-

wards others. \* \* \* There is substantial evidence of a great emotional instability, unpredictability and lack of impulse control with explosive behavior that renders her dangerous.

Just over a year after Mikulanec's commitment, on December 31, 1979, a Department of Public Welfare Special Review Board examined her case. Discussing her progress in relation to a fact situation similar to that with Rosenthal, the board found that:

The testimony was conclusive that assuming the same fact situation were to arise that Ms. Mikulanec has not received sufficient treatment so as to handle the same fact situation without acting out in a hostile and aggressive manner. Although the resident's behavior has been that of a model patient, it appears her behavior was exemplary before the killing which precipitated this commitment. Inasmuch as the killing was itself very bizarre, and resulted in the infliction of some ninety stab wounds in the decedent, that *the risks involved are extraordinary and should be treated accordingly.* There has been no insight therapy and very little progress shown since the date of admission. This does not overlook the fact that the resident has been helpful on the ward and is the model patient as heretofore referred, *in terms of treatment and progress, however, there has been little.*

(Emphasis added.)

Mikulanec's delusional world relates to her relationships with men. Her intense desire to be loved, to the point of deluding herself, makes her particularly vulnerable to the "charms" of a man like Ward. Dr. Gottlieb and others fear not only that this marriage would interfere with treatment, but that the end result could be as violent as the end of Mikulanec's "friendship" with Al Rosenthal.

The issues raised on appeal are:

1. Under the present statute, can a guardian or conservator be appointed to approve or disapprove of a marriage?

2. If so, is such an appointment constitutional?

1. *The Guardianship/Conservatorship Statute*

Only after showing by "clear and convincing evidence," Minn.Stat. § 525.551, subd. 3 (1982), that an individual is "impaired to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person, and who has demonstrated deficits in behavior which evidence his inability to meet his needs for medical care, nutrition, clothing, shelter, or safety," Minn. Stat. § 525.54, subd. 2 (1982), will a person be considered "incapacitated" and therefor subject to a guardianship or conservatorship of his person. The court must issue specific findings of fact and grant the guardian or conservator "only those powers necessary to provide for the demonstrated needs of the ward or conservatee." Minn.Stat. § 525.56, subd. 2 (1982). If all powers are granted, a guardianship is established; if less than all powers are granted, a conservatorship is established. Minn. Stat. § 525.539, subd. 2, 3 (1982).

The present guardianship statute, particularly the sections of the statute relevant to this case, are the result of massive revisions almost amounting to a rewriting of the statute in 1980. Act of April 7, 1980, ch. 493, 1980 Minn.Laws 414. The revisions came in response to news stories detailing heinous abuses of the old guardianship statute. Case studies chronicled guardians acting as conmen to obtain the guardianship and discount wholesalers to dispose of their wards' estates. Everything was legal; the wards had no recourse.

Groups concerned with the rights of the aged and mentally retarded had been working on proposals to modify the statute even before the news articles. The actual bill that reached the legislature was drafted by the Legal Advocacy Project for the Developmentally Disabled. The language of the bill comes from many sources such as the Uniform Probate Code, the Minnesota Men-

tal Retardation Protection Act and the ingenuity of the authors. The purpose of the amendments, according to one of the Senate sponsors of the bill, was

> an attempt to rewrite the guardianship statute with clear definitions of what incapacity involves and some more specific statements about the powers and duties of a guardian and it expands the due process rights of a proposed ward in a guardianship hearing and increases the requirements of information that must be included in the notice of the proceeding to the proposed ward or conservatee.

Testimony of Senator Spear before Senate Subcommittee on Judicial Administration, Feb. 18, 1980.

Pervading the bill and the testimony about it is a suspicion that guardians are too often less than benevolent. The thrust of the bill was to make it harder to create a guardianship and, once one is created, that the powers of the guardian should be kept to the bare minimum necessary to care for the ward's needs. The act does not necessarily restrict the powers available to a guardian or conservator in the abstract; it just provides that the actual powers granted should be no more than absolutely necessary in a particular case.

■ The trial court found that "petitioner failed to sustain the burden of proof of incompetence by clear and convincing evidence * * *." This conclusion, however, does not fully square with other facts found by the trial court. Although finding Mikulanec generally competent, the trial court also found that she still suffers from the same disorder that originally caused her to be confined as mentally ill and dangerous. That disorder, which the trial court makes light of as "limited in scope in that she * * * react[s] in stressful situations as described in the original Order of Commitment," seriously affects her ability to choose a mate. The Order of Commitment specifically notes that she is "delusional," "unpredictable," "explosive," and "when others do not respond as she wishes, she is likely to become enraged and lash out in an outburst of anger." The trial court, even though denying the request for guardian or conservator, stated in its memorandum:

> After hearing the evidence and reviewing the record, the Court is satisfied that should this marriage take place it will, in all probability, end in some form of turbulence in the absence of divine or miraculous intervention. But the Court must follow the limitation of the law as it exists * * *.

Because of a mental problem, she cannot realistically gauge men's affections for her. She builds a delusional world around a man and his affections for her. When reality crashes in upon her delusional world, she violently, and at least once before murderously, lashes out. The limited scope of Mikulanec's disability relates directly to the question of choosing a mate. She lacks sufficient understanding to make a responsible decision concerning the choice of a mate and therefore is incapacitated under the court's findings.

After determining a person incapacitated, the trial court must specify the powers of a guardian or conservator. The trial court assumed, however, that it had no power under the statute to grant a guardian the power to approve or disapprove of a marriage.

The language of the statute seems to indicate that the powers available in the abstract are broad:

> The duties and powers of a guardian or those which the court may grant to a conservator of the person include, *but are not limited to:*
>
> (1) The power to have custody of the ward or conservatee and the power to establish his place of abode within or without the state * * *.
>
> (2) The duty to provide for the ward's or conservatee's care, comfort and maintenance needs, including food, clothing, shelter, health care, social and recreational requirements, and, whenever appropriate, training, education and rehabilitation. * * * Whenever possible and appropriate, the guardian or conservator should meet these requirements through

governmental benefits or services to which the ward or conservatee is entitled * * *.

(3) The duty to take reasonable care of the ward's or conservatee's clothing, furniture, vehicles and other personal effects, and, if other property requires protection, the power to seek appointment of a guardian or conservator of the estate. * * *

(4)(a) The power to give any necessary consent to enable the ward or conservatee to receive necessary medical or other professional care, counsel, treatment or service, except that no guardian or conservator may give consent for psychosurgery, electroshock, sterilization or experimental treatment of any kind unless the procedure is first approved by order of the court * * *.

* * * * * *

(5) The power to approve or withhold approval of any contract, except for necessities, which the ward or conservatee may wish to make.

(6) The duty and power to exercise supervisory authority over the ward or conservatee in a manner which limits his civil rights and restricts his personal freedom only to the extent necessary to provide needed care and services.

Minn.Stat. § 525.56, subd. 3 (1982) (emphasis added). The enumerated powers cover the most common eventualities.

The general intent of the enumeration section seems to make full powers over a person available in the abstract, but to limit the actual powers given in a particular case by requiring the court to grant specifically the least amount of power necessary to protect a potential ward in the individual case. This is emphasized by the fact that the list of powers is nonexclusive. The powers available in the abstract are "not limited to" those enumerated powers. One incapacitated with respect to choosing a spouse then should have the benefit of a guardian's guidance, but only to the extent of approving or disapproving of a marriage.

Subdivision 6 of the statute grants power to restrict a ward's or conservatee's civil rights and personal freedom as long as the restrictions are no more than necessary. Freedom to choose a spouse is one of those personal freedoms which may, under proper circumstances, be restricted. In certain rare cases, such as this case, where a person clearly is incapacitated with respect to choosing a spouse, a court may appoint a conservator of the person to approve or disapprove of a marriage.

The trial court felt that the case of *Johnson v. Johnson,* 214 Minn. 462, 8 N.W.2d 620 (1943), prohibits guardians or conservators from ever approving or disapproving of a marriage. In *Johnson,* an elderly man, incompetent to manage his estate, married. His guardian sought to annul the marriage. This court found that:

[A]ppointment of a guardian disables the alleged incompetent only from making contracts which relate to his estate, but not other kinds of contracts. One who has been adjudged an incompetent may contract a valid marriage if he has in fact sufficient mental capacity for that purpose.

*Id.* at 466, 8 N.W.2d at 622. Under the present statute, Mr. Johnson would have been subject to a guardianship of his estate. Mikulanec would be subject, however, to a guardianship or, more properly, a conservatorship of her person. A person in Mr. Johnson's situation, needing a guardian of his estate, would still presumably be capable of contracting a marriage. The case does not speak to, and therefore should not be seen as foreclosing, the possibility that a person could have a specific incapacity to choose a spouse, requiring a conservator of the person.

### 2. *Constitutional Question*

The United States Supreme Court has noted that "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). In particular, marriage is part of the fundamental

right of privacy. *Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 679–80, 54 L.Ed.2d 618 (1978). It is, however, a social relationship subject to the state's police powers. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Justice Marshall, in *Zablocki,* noted that:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

*Zablocki,* 434 U.S. at 386, 98 S.Ct. at 681. When a state action does significantly interfere with the decision to marry, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Id.* at 388, 98 S.Ct. at 682.

In the present case, the statute, on its face, does not interfere with the right to marry, but could in application. The interference is directly related to competence to marry, presumably a reasonable prerequisite. Thus, strict scrutiny of the statute should not be applied. Even if strict scrutiny did apply, the state has a significant interest: making sure those entering marriage are competent, preventing abuse and perhaps murder. The restraint is closely tailored: Only those found "incapacitated with respect to choosing a spouse" could have conservators appointed for them. Once that determination was made, the guardian could only be given the limited powers necessary to protect the ward. The statute would, therefore, not violate the 14th Amendment even if subject to strict scrutiny test.

The case is remanded to the trial court with instructions to appoint a conservator with a limited power to determine whether the ward should be permitted to marry and to whom.