ter does reflect traits of integrity and trustworthiness.

COYNE, Justice.

I join the dissent of Justice KELLEY.

Kirk W. Reilly, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Coleen M. Brady, Asst. Hennepin County Atty., Minneapolis, for respondent.

**In the Matter of John Carroll KOTTKE.**

**No. C3-87-2381.**

Supreme Court of Minnesota.

Dec. 30, 1988.

OPINION

WAHL, Justice.

This case requires us to examine the distinction drawn by the legislature between "mentally ill" and "mentally ill and dangerous" in Minn.Stat. § 253B.02, subds. 13 and 17 (1986). John Carroll Kottke was committed to the Minnesota Security Hospital as mentally ill and dangerous by order of the Hennepin County District Court on November 25, 1987. He argues on appeal that there was not clear and convincing evidence by which the trial court could find him mentally ill and dangerous as that term is defined by § 253B.02, subd. 17. We agree.

Kottke is a man of about 40 years of age who resides in Hennepin County. He has no record of mental health commitment in Minnesota. He apparently has a 100% disability pension through the Veterans Administration and may have had some contact with the Minneapolis Veteran's Administration Hospital some 17 years ago. Beyond these facts, little is known about him.

Kottke first came to the attention of the legal system on October 26, 1987. On that date, he was observed by security guard Kirk Hargrove entering the Crystal Court of the IDS Center in Minneapolis. Hargrove had seen Kottke on several occasions and had escorted him out of the building without incident. On this particular day, Kottke was making "dancing turns," which

on past occasions Hargrove had seen "get kind of wild." Concerned that Kottke might injure someone, Hargrove asked him to leave the building and not to come back again. Kottke announced that he owned the building and that Hargrove was fired. Hargrove escorted petitioner from the building, and as the two men left the revolving doors, Kottke struck out with a slightly closed fist, leaving red knuckle marks across Hargrove's face. Hargrove was able to subdue and handcuff Kottke, keeping him under citizen's arrest until the police arrived.

On November 7, 1987, Dayton's loss prevention investigator Michael Strauss observed Kottke making racial slurs at an unidentified man on Nicollet Mall outside Dayton's in downtown Minneapolis. When the man poised to fight, Kottke ran off and Strauss turned away. Seconds later Kottke struck Strauss on the back with both fists, causing Strauss to fall to the ground and sprain his thumb. Strauss turned, blocked a second blow, and handcuffed Kottke.

As a result of these two incidents, Kottke was charged with two counts of misdemeanor simple assault. He appeared *pro se* on November 10, 1987. The trial judge raised the question of Kottke's competency and referred him to court psychologist, Dr. Sharon Frederiksen, for a determination as to whether he was competent to proceed in the criminal system.

Dr. Frederiksen interviewed Kottke for 15 to 20 minutes on November 12, 1987 at the Hennepin County Adult Detention Center. She observed him to be clean, well-groomed and polite. She also found him, and so indicated in her report, to be suffering from a major mental disorder marked by rambling speech, incomplete sentences and clearly delusional claims. Kottke claimed to own Dayton's and said he was recognized as "owner Kottke" by the Dayton's employees. Kottke also said that he was "Dr. Kottke, M.D., Ph.D., surgeon," graduated from the University of Minnesota and that he owned several hotels downtown, including the one in which he lives. He also stated that he owned the University of Minnesota and offered Dr. Frederiksen a "family rate" on any refresher course she might need.

When Dr. Frederiksen asked about the assault charges, Kottke's garbled responses indicated an incomplete comprehension of the legal proceedings. He claimed "[t]hey want to believe I skibed [sic] the security guard, its a game they play, they know I'm wealthy and want money." He indicated that he could face "a jail sentence of up to six months or the child could get death." Dr. Frederiksen concluded Kottke acted on the basis of his delusions, "in a manner that has caused physical harm to others on two separate occasions." She made a tentative diagnosis of paranoid schizophrenia and recommended he be found incompetent to proceed in the legal system. She recommended further that the case be transferred to the Probate Court "for possible mental health commitment as mentally ill and dangerous." The trial court issued a Petition for Judicial Commitment and suspended the criminal proceedings pending commitment or other disposition.

Dr. David Wiener, court appointed examiner for commitment purposes, examined Kottke on November 18, 1987. He also examined Kottke's medical records from the Hennepin County Medical Center, records which detailed Kottke's treatment and conduct during his 10–day stay at the center.

The commitment hearing was held on November 24, 1987. Dr. Frederiksen, called by the state, testified that, while Kottke gave no indication of being a danger to himself, he was a threat to others who might come within his delusional framework. On cross examination, she testified that her diagnosis had been a tentative one, since she had been directed to ascertain competency, and at the time of the examination, had no medical records available to her for review.

Dr. Wiener, in his testimony, diagnosed Kottke as schizophrenic, disorganized type

with paranoid features, and was of the opinion that Kottke was mentally ill as statutorily defined. In response to the court's questioning, Dr. Wiener characterized Kottke as "extremely mild-mannered" throughout his medical history with no indication of other such behavior. Dr. Wiener further testified that as to the assaults, Kottke "simply struck out in a rather ineffectual way and then immediately retreated and became in his usual mild-mannered self" [sic]. The medical records from the Hennepin County Medical Center that Dr. Wiener had reviewed indicated that Kottke had been very cooperative during his ten day stay, complying with his medication and even requesting medication when he needed it. Dr. Wiener concluded Kottke was not a clear danger to others and did not meet the statutory standard for dangerousness. He recommended that Kottke be treated on an outpatient basis with antipsychotic medications.

The probate court issued its findings of fact and conclusions of law on November 25, 1987. The court concluded that Kottke had a mental illness which caused substantial psychiatric disorder. As a result of that mental illness, the court found Kottke posed "a substantial likelihood of physical harm to himself or others as demonstrated by his annoying public behavior, his insulting comments to others, and his two unprovoked assaults." Because Kottke had apparently committed one assault in response to a delusion, and he continued to hold delusional beliefs, the court concluded that a substantial risk existed that Kottke would engage in further acts "of a similar, serious nature." The court found Kottke to be mentally ill and dangerous to the public under Minn.Stat. § 253B.02, subd. 17 (1986) and committed him to the Minnesota Security Hospital. In an attached memorandum, the court justified its rejection of Dr. Wiener's conclusion that Kottke was not dangerous:

It is clear that the court and its examiner, Daniel Wiener, Ph.D., hold vastly different views of what constitutes danger to the public. It is the court's view

that respondent's mental illness led him to completely untolerable public behavior on at least three occasions during two separate days.

The court of appeals affirmed the order of commitment as mentally ill and dangerous in an unpublished opinion filed February 8, 1988. We reverse.

There is no question that Kottke was mentally ill and that his illness led to the two assaults. As such, Kottke could have been committed as "mentally ill" under the Minnesota Commitment Act of 1982, Minn. Stat. § 253B.02, subd. 13 (1986). Subdivision 13 provides, in relevant part, that a

"Mentally ill person" means any person who has * * * a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (b) poses a substantial likelihood of physical harm to self or others as demonstrated by (i) a recent attempt or threat to physically harm self or others * * *.

Minn.Stat. § 253B.02, subd. 13 (1986).

The question before us is whether petitioner is so dangerous as to warrant the judicial determination of "mentally ill and dangerous to the public" under Minn.Stat. § 253B.02, subd. 17 (1986), which is defined as:

a person (a) who is mentally ill; and (b) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

A judicial determination of "mentally ill and dangerous" (MID) impinges significantly upon an individual's liberty interests. A finding of MID generally results

in commitment to the Minnesota Security Hospital in St. Peter. A treatment report is filed by the hospital after 60 days, at which time the court must hold a hearing to make a final determination as to whether the individual is still "mentally ill and dangerous." Minn.Stat. § 253B.18, subd. 2 (1986). If the court so finds, the individual is committed for an indeterminate amount of time. Minn.Stat. § 253B.18, subd. 3 (1986). This designation also affects any future commitment determinations, as its indication of past dangerousness is used to predict future dangerousness.

To be committed as either mentally ill or as mentally ill and dangerous requires more than just the presence of mental illness. Subdivision 17 requires that an individual pose a clear danger of causing serious physical harm to self or others. In contrast, under subdivision 13 an individual who poses a "substantial likelihood of physical harm to self or others" may only be committed as mentally ill, not as mentally ill and dangerous. In the case before us we must determine whether Kottke's behavior met the statutory standard of "serious physical harm" required for a determination of mentally ill and dangerous.

The legislature has provided no definition of "serious physical harm" in the Minnesota Commitment Act. We are left, as was the court of appeals in In re Lufsky, 388 N.W.2d 763, 766 (Minn.App.1986), with the common understanding of the word serious. The "common understanding" standard, however, does not allow the physical consequences of any affront to be labeled as serious. Due respect must be paid to the distinction made by the legislature between "physical harm" and "serious physical harm" in subdivisions 13 and 17.

The Lufsky court upheld the MID determination. Lufsky had previously dragged his father from their house by an electrical cord he had wrapped around his father's neck, had repeatedly threatened and assaulted patients and staff at a care facility, and had offered to hold a "shoot-out" with his arresting officers. In re Lufsky, 388 N.W.2d at 764. Similarly extreme acts have resulted in commitments to the Security Hospital as mentally ill and dangerous. See, e.g. Jarvis v. Levine, 418 N.W.2d 139 (Minn.1988) (shot and killed sister); In re Mikulanec, 356 N.W.2d 683 (Minn.1984) (stabbed wife of man she delusionally believed loved her); DeMars v. State, 352 N.W.2d 13 (Minn.1984) (murdered sleeping mother). Less violent conduct than that illustrated in the cases cited can, of course, constitute serious physical harm. It is not necessary that mayhem or murder occur. It is clear to us, however, that Kottke's conduct, intolerable as it was, neither inflicted nor was intended to inflict the serious physical harm of the type contemplated by the statute.

Kottke's actions were not without consequences, and the probate court was correct in concluding that they merited some medical intervention. The court accurately perceived the need to protect members of the public from such behavior. We disagree only with the determination that Kottke was mentally ill and dangerous. Kottke's actions more appropriately met the statutory definition of mentally ill set out in Minn.Stat. § 253B.02, subd. 13 (1986). We hold, therefore, that the evidence was insufficient to prove by the clear and convincing standard that Kottke was mentally ill and dangerous as defined by Minn.Stat. § 253B.02, subd. 17 (1986).

Kottke was initially placed in the Security Hospital while review of this case was pending. At the end of 60 days, he was adjudged to be no longer dangerous and was released. At oral argument, counsel were unable to state conclusively that Kottke's release cleared his record of the "mentally ill and dangerous" label given to him. We reverse the judgment of the court of appeals and the order of the probate court insofar as it determines Kottke to be mentally ill and dangerous. The label of dangerous is to be expunged from petitioner's record.

Reversed and remanded for proceedings consistent with this opinion.