**In the Matter of Dirk Christian KNOPS.**

No. C8–94–1309.

Supreme Court of Minnesota.

Aug. 25, 1995.

Michael O. Freeman, Hennepin County Atty., Gayle C. Hendley–Zappia, Asst. County Atty., Minneapolis, for appellant.

Warren J. Maas, Brooklyn Park, for respondent.

## OPINION

**TOMLJANOVICH, Justice.**

Dirk Knops was charged with criminal sexual conduct in the first degree for the molestation of a four-year-old girl, K.B. The court-appointed psychiatrist opined and the trial judge found that Knops was mentally ill and incapable of participating in the proceedings. Knops was then referred for commitment proceedings pursuant to Minn. R.Crim.P. 20.01. At those proceedings, the trial court found that Knops was mentally ill and that he committed an overt act by digitally penetrating K.B., thus, the trial court committed Knops as mentally ill and dangerous (MID).

The court of appeals reversed, finding that while Knops is mentally ill, the State had failed to prove by clear and convincing evidence Knops had digitally penetrated K.B. Because we believe that sufficient evidence existed from which the trial court could find that Knops digitally penetrated K.B., we reverse the court of appeals and reinstate the trial court's decision.

On October 8, 1993, allegations of sexual abuse were filed against Dirk Knops with the Mound Police Department by the mother of K.B. Officer Todd Traux was assigned to investigate the case. Officer Traux scheduled an interview with K.B. at Corner House, a business specializing in interviewing sexual abuse victims. During the interview, K.B. revealed Knops had touched her on her "private parts," breasts, and buttocks on six separate occasions. She stated Knops pulled down her pants, touched her, and on several occasions stuck his thumb and index finger into her private parts and wiggled it around. She stated, "It hurted" and that "it felt like a rubber apple" on her private parts. K.B. described one situation in which Knops used a rabbit and raccoon puppet as well as his finger to touch her vagina, breasts, and but-

tocks. K.B. used anatomically correct dolls to show and describe what happened to her.

On October 27, 1993, K.B. returned to Corner House for a medical examination for signs of sexual abuse. Dr. Gary Fifield performed the examination. Dr. Fifield observed:

> In general I noted that initially on observation without manipulating the genitalia at all, the area of the hymenal ring and the entrance to the vagina was clearly open in a way that is not typical in most examinations because of the presence of hymenal tissue. And then as I looked more closely including some further exposure of that area of the hymen and the vagina opening, I noted that there really was not any hymenal tissue present and I felt that was a significant physical finding.

Dr. Fifield found the lack of hymenal tissue to be a result of and consistent with the theory of digital penetration.

On October 22, 1993, Officer Traux and Officer Nickom went to Knop's apartment with a search warrant. He lived in the same apartment complex as K.B. He opened the door, was given a copy of the search warrant, and directed Officer Traux to the puppets, a raccoon and a rabbit. Officer Traux recalls Knops told him that he knew that the search warrant was about committing crimes with children using puppets. Officer Traux informed Knops of his Miranda rights, which he waived, but did not place him under arrest.

Knops admits to touching K.B. on several occasions for "sensual pleasure," but denies penetration. Some of his statements include:

> [M]y thumbs went under her buttocks in the crease between her upper thigh and buttocks my thumbs ah did ... did reach some depth but did not penetrate ah, sexual areas.

> [M]y thumb just ... just settled on the lower curvature of her ... of her buttocks, on the side but a little bit toward ... more

toward the outer margin at ... at initially and I steadied ... I steadied her and myself and then I continued and deepened the contact by ah a deliberate act of will. * * * For to ... achieve a sensual result for myself.

> [M]y thumbs went along the upper margin of her buttocks, the upper swelling of her buttocks and as I stepped down and she would step down alternately my hands did move up and down upon her in I believe a natural motion but I was enjoying the contact. I ah ... I felt a sensual pleasure in the contact.

> [M]y index fingers at some point there and I do not remember this ... I do not remember this, but there is the possibility that they came in contact with the posterior portion of her labial folds * * * I did derive sensual pleasure from her sitting on my hands from the folding of her buttocks.

> I was touching the perineal area. * * * At the same time rotating my left hand again, ah, which would bring my fingers pointing toward my other fingers and then ... and up into the crease between her buttocks and the rectal area ... toward the back but it would still leave my index and second finger, middle finger, ah very close to the rear margin of her labia * * * her entire pelvis shifted to the right and the right side of her pelvis dropped down causing it to rotate over the edge of my fingers and my fingers did go deeper. They went deeper into ah they went deeper into that perineal region, the rectal vulva perineal region and ah I think its the perineal I believe * * *

Knops stated that he was aware he was touching K.B. in inappropriate ways and that it was child molestation;[1] however, he believed it was "of a type * * * that does not harm the child so long as I am in control of myself."

On November 3, 1993, Knops was charged with criminal sexual conduct in the first de-

---

1. Knops admitted that he used as many as four girls besides K.B., none older than age 11, to derive sexual pleasure from. Knops, for the purpose of deriving sexual pleasure, volunteered to put lotion on a young neighborhood girl of about 10 years of age. In another instance, while aroused by the sight of another neighborhood girl in a gymnastic suit and wanting to touch her skin, Knops asked her to come over to him. When she did, he reached down and adjusted the hemline of the suit in the pubic area.

gree. On December 17, 1993, the trial court referred Knops to the Hennepin County District Court—Mental Health Division for an opinion as to whether he would be competent to stand trial. Knops was referred to the Hennepin County Medical Center (HCMC) for a psychiatric evaluation. Dr. Dallas Erdmann performed the evaluation. He found that Knops had a past psychiatric history.[2]

Dr. Erdmann diagnosed Knops as suffering from a substantial psychiatric disorder, severe obsessive compulsive disorder and bipolar affective disorder. Erdmann opined that Knops was presently incapable of understanding the criminal proceeding against him or of participating in his defense as a result of his mental illness. On December 17, 1993, the trial court determined that Knops was mentally ill and incapable of standing trial.

On January 7, 1994, Knops was committed as mentally ill, but the issue of commitment as MID was deferred until a 60–day evaluation of Knops at the Minnesota Security Hospital (MSH) had been completed. A treatment team at the MSH conducted a Minnesota Multiphasic Personality Inventory, Second Edition (MMPI–II) and an Interpersonal Behavioral Survey, a Shipley Institute of Living Scale, a Sentence Completion Test, and a Bender Gestalt Test on Knops.[3] Kenneth Martens of the MSH testified that Knops was diagnosed as having a schizo affective

disorder and obsessive compulsive disorder. His obsessive compulsive disorder revolves around intrusive sexual thoughts of becoming involved with children, losing control, and becoming a pedophile.

Martens recommended that Knops be committed as MID due to his obsession with sexual matters. Further, Martens testified that even if no overt act had occurred, he would still recommend commitment as MID, since there is a substantial likelihood that Knops would engage in acts capable of inflicting serious harm to others in the future. Martens believes that his condition can be improved with medication, but with his history of not following through with the medication on his own, commitment and supervision is needed.

Harry Hoberman, the court's psychologist, diagnosed Knops with schizo affective disorder and obsessive compulsive disorder. Hoberman testified that Knops' mental illness grossly impairs his behavior making him engage in inappropriate sexual behavior with nonadult females. In making his assessment, Hoberman relied on Knop's statement, "I am not a child abuser or molester, but I will become one, I cannot rely on my own morality any more." Hoberman recommended that he be committed as MID.

2. Knops was hospitalized for about two months in 1975 for depression at Abbott Northwestern Hospital. His condition was described as "remarkably withdrawn, flattened of affect and recognizes that he was unable to complete any reasonable act." The Minnesota Multiphasic Personality Inventory (MMPI) showed "a severe depressive reaction with social withdrawal in an obsessional personality type." He was given an antidepressant medication.

Several years later, Knops was briefly hospitalized at the University of Minnesota Hospital & Clinic and then placed in an outpatient program. Dr. David Opsahl was his attending physician in the Outpatient Psychiatry Clinic from October 1981 to June 1984. Knops was diagnosed with Mixed Bipolar Affective Disorder, Obsessive Compulsive Disorder, Pedophilia (fantasy only), and provisional diagnosis of Schizotypal Personality Disorder. An MMPI was conducted and it was positive for depression with "excessive morbid rumination and significant psychosexual conflicts." Throughout the course of his therapy at the University, he was treated with a variety of

drugs, mostly antidepressants. The drugs were able to stabilize his condition. Concluding treatment summary noted that he continued to be "perplexed and bothered by highly distressing, troubling and somewhat disorganized thoughts of a sexual nature."

3. On the MMPI–II test, Knops scored 2–7, which is indicative of depression, some pessimism, anxiety, tension and nervousness. People with this diagnosis tend to be obsessed with their personal deficiencies and are perfectionists who are guilt ridden when they fail to meet their own standards. The Bender Gestalt Test showed impotence, signs of motor incoordination and that he lacked cohesion. The Interpersonal Behavior Survey showed Knop's scale in social skills and feelings of shyness as well as the scale which measure a person's tendency to be dependent on others for support to be elevated beyond the normal limit. The Shipley Institute of Living Scale test showed him to be of above average intelligence. The Incomplete Sentence test reflected him to have low self-esteem and social ineptness.

On appeal, this court is limited to an examination of the trial court's compliance with the statute, and the commitment must be justified by findings based upon evidence at the hearing. Minn.Stat. § 253B.09, subd. 2 (1994); Minn.R.Civ.Commitment 11.01. The record is viewed in the light most favorable to the trial court's decision. *DeMars v. State*, 352 N.W.2d 13, 16 (Minn.1984). Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witness. Minn. R.Civ.P. 52.01. Where the findings of fact rest almost entirely on expert testimony, the trial court's evaluation of credibility is of particular significance. *In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986).

Minn.Stat. § 253B.02, subd. 17 (1994) defines a person who is mentally ill and dangerous to the public to be a person:

(a) who is mentally ill; and

(b) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

This court has consistently interpreted this statutory provision strictly. *In re Jasmer*, 447 N.W.2d 192, 195 (Minn.1989).

In this case, commitment as MID turns on whether an overt act causing or attempting to cause serious physical harm occurred. Whether evidence is sufficient to prove an overt act is a legal question and is subject to de novo review. *See In re Kottke*, 433 N.W.2d 881, 884 (Minn.1988). The word "serious" used in mentally ill and dangerous commitment cases is limited to the common understanding of the word. *Id.* In *Kottke*, this court determined that striking a man in the face and another man in the back did not rise to a level of serious physical harm. The *Kottke* court suggests that only extreme acts of violence satisfy the statutory requirement of serious physical harm. *Id.* (citing *Jarvis*

*v. Levine*, 418 N.W.2d 139 (Minn.1988) (shot and killed sister); *In re Mikulanec*, 356 N.W.2d 683 (Minn.1984) (stabbed wife of man she delusionally believed loved her); *DeMars v. State*, 352 N.W.2d 13 (Minn.1984) (murdered sleeping mother)). Nevertheless, this court went on to conclude that serious physical harm can be found in less violent crimes since murder or mayhem need not occur. *Id.*

In *Kottke*, we overturned the MID commitment stating that while two individuals were assaulted, the assaults did not cause serious physical injury and did not give rise to an actionable level of dangerousness. 433 N.W.2d at 884. In *In re Rickmyer*, this court held that a pedophile's unauthorized sexual "touching" and "spankings," without penetration, while repellent, are not enough to support the trial court's conclusion that he had inflicted or is likely to inflict serious physical or mental harm on his victims. 519 N.W.2d 188, 190 (1994).

In this case, the trial court relied heavily on the expert testimony that the absence of hymenal tissue was caused by repeated digital penetration. The court of appeals found the expert testimony to be insufficient evidence because the expert did not know for certain how much pain K.B. felt. The focus in cases of this nature should not be on the severity of the pain, but on the seriousness of the act and whether it did occur. While the video taped statement on its own does not rise to the level of clear and convincing evidence, the entire record clearly and convincingly supports the trial court's conclusion that digital penetration occurred. *See Johnson v. Noot*, 323 N.W.2d 724, 728 (Minn.1982) (holding where the pertinent facts are supported by the record as a whole, the evidence is not clearly erroneous).

This case is distinguishable from *Kottke* and *Rickmyer*. In *Kottke*, this court determined that Kottke's conduct neither inflicted nor was intended to inflict the serious physical harm of the type contemplated by the statute. 433 N.W.2d at 884. Unlike *Rickmyer*, this case involves not only the touching of the genital area, buttocks and breasts, but also the penetration of the vagina. While the penetration did not cause

severe pain to K.B., Knop's use of his fingers to penetrate the victim's vagina which caused the removal of her hymenal tissue constitutes a serious physical injury. *See Jasmer,* 447 N.W.2d at 195. Furthermore, the statute does not require that there be severe pain as the court of appeals suggests, only serious physical harm. Minn.Stat. § 253B.02, subd. 17. Thus, digital penetration resulting in the removal of the victim's hymenal membrane satisfies the overt act requirement.

Accordingly, the decision of the trial court is reinstated.