RANDALL, Judge*
In 1991, Thomas Ray Duvall was civilly committed as a "psychopathic personality" under what was then Minn. Stat. § 526.09 (1990). In 2014, Duvall requested a provisional discharge from his commitment. A judicial appeal panel[1] granted his request.
*890 The commissioner of human services and Hennepin County appeal. We conclude the panel did not err by finding that Duvall satisfied the statutory requirements for provisional discharge.
FACTS
In 1991, Duvall was civilly committed to the Minnesota Security Hospital as a psychopathic personality under what was then Minn. Stat. § 526.09 (1990). Duvall's commitment was based on repeated sexual assaults that occurred over thirty years ago. Duvall's first known sexual offense occurred in May 1975, when he and two other males raped a 17-year-old girl. On September 4, 1978, Duvall again raped a 17-year-old girl. He pleaded guilty to criminal sexual conduct in the third degree. Duvall attended treatment for approximately three months, left treatment, and was sent to prison. Duvall was released from prison in September 1980. He was later arrested on February 25, 1981, after he attempted to force a woman into his car and threatened her with a knife. Based on this offense, Duvall was convicted for assault and making terroristic threats. Duvall was imprisoned and released on March 21, 1982.
On March 24, 1982, Duvall sexually assaulted three girls. Duvall was imprisoned for these assaults until December 4, 1987. Following his release, Duvall was placed on supervised release at a sexual-offender treatment program. On December 26, 1987, shortly after his release from prison, Duvall violently sexually assaulted a 17-year-old girl in her apartment over a three-hour period. Duvall was sentenced to 240 months of incarceration.
Based on Duvall's history of sexual misconduct, a detective petitioned the district court to judicially commit Duvall on January 23, 1991. On April 4, 1991, the Hennepin County District Court granted the petition for civil commitment and committed Duvall to the custody of the Minnesota Security Hospital following his prison sentence. The district court held another hearing pursuant to Minn. Stat. § 253B.19, subd. 2 (1990), and indeterminately committed Duvall to the Minnesota Security Hospital to receive treatment for his sexual aggression. Duvall appealed the district court's commitment order on September 13, 1991, and we affirmed. In re Duvall , No. C5-91-1799, 1991 WL 276194 (Minn. App. Dec. 31, 1991), review denied (Minn. Mar. 26, 1992).
Duvall has received treatment at his current treatment location at the Minnesota Sex Offender Program (MSOP) in St. Peter since May 3, 2001. Duvall has been in the community preparation services (CPS) portion of the program since April 8, 2009. CPS provides treatment for clients who have successfully progressed through all three treatment phases at MSOP, and includes three stages that provide the client with an increasing level of accountability while remaining under supervision. Duvall has been in the final stage of CPS since April 22, 2010.
This final stage of treatment requires Duvall to follow his individual treatment plan, maintain a community-based support system, demonstrate leadership skills, and prepare for his provisional discharge and transition into the community. Duvall has achieved all of the privileges that he can obtain during treatment, regularly participates *891 in supervised, off-campus visits, and has had no reported issues or incidents from his time in the community. Duvall also participates in a men's support group at Project Pathfinder that helps him develop healthy sexual boundaries.
Based on his success in the last stage of his treatment, Duvall petitioned the SRB for a provisional discharge from his commitment on June 25, 2015. The SRB conducted a hearing and recommended provisional discharge on March 3, 2016. The Commissioner of the Minnesota Department of Human Services (commissioner) and Hennepin County (county) objected to the recommendation and requested a hearing before a judicial appeal panel. The panel held a five-day hearing in April 2017. Duvall called 18 witnesses. Four MSOP security counselors, two MSOP reintegration specialists, MSOP's operations supervisor and MSOP's reintegration director all testified that Duvall never engaged in behavior when he was interacting with others in the community that led them to be concerned for Duvall's or others' safety. The MSOP employees' testimony demonstrated that Duvall has participated in hundreds of community outings throughout his treatment and none of the MSOP employees ever witnessed Duvall engage in concerning behavior when he was in the community. Kristin Dehrkoop, Duvall's therapist from May 2015 to December 2016, testified that she supported Duvall's petition based on her experience as his therapist. Kristi Mike, Duvall's therapist from December 2016 to the time of the hearing, testified that she also supported his petition because he has successfully completed every phase of treatment offered by MSOP. Timothy Benesch, the director of CPS at MSOP, testified that Duvall was transparent and had no reported incidents of behavioral issues. Benesch also stated that he supported Duvall's petition for provisional discharge.
Others within the community also testified about their interactions with Duvall throughout his time in treatment. Duvall's Alcoholics Anonymous sponsor testified that he had worked with Duvall on his sobriety since 2004 and would continue serving as his sponsor if he were provisionally discharged. Thomas Jones, a community volunteer at Project Pathfinder, testified that Duvall has come to "Choosing Healthy Sexual Boundaries" meetings for three years and facilitates meetings, provides positive feedback, and does not act with excessive control or leadership during the meetings. Duvall's manager at the thrift store where he volunteers testified that Duvall made a positive impact and was respectful, courteous, reliable, helpful to others, and diligent when volunteering. Duvall's brother, Scott Duvall, testified about his relationship with Duvall. He explained that they speak at least once per week and he intends to stay in Duvall's life if he is provisionally discharged. Christopher Onken, the owner of a group home, testified that the group home could provide treatment and housing services to Duvall if he were provisionally discharged. Duvall also testified about his past treatment, current treatment setting, and how he intends to treat his sexual issues if he is released. Duvall also called Dr. Lauren Herbert, the director of the forensic evaluation department in the Department of Human Services. She testified that she supports Duvall's petition for provisional discharge based on her psychosexual evaluation of Duvall.
The commissioner called four witnesses. Jerome Brown, a polygraph examiner, testified that Duvall did not pass polygraph exams that asked him about his transparency in his sexual fantasy logs. The commissioner also called Dr. James Alsdurf, the court-appointed examiner at the hearing. Dr. Alsdurf concluded that Duvall *892 needed continuing treatment and supervision in his current setting. The state also called two clinical psychologists as expert witnesses, Dr. Mary Kenning and Dr. Harry Hoberman. They did not interview Duvall. They conducted "psychosexual evaluations" based on Duvall's treatment records and then recommended that his petition for provisional discharge be denied.
In January 2018, the judicial appeal panel issued a 40-page order and memorandum of law granting Duvall's petition for provisional discharge. The panel concluded that Duvall no longer required treatment in his current setting and that the provisional discharge plan provided a reasonable degree of protection to the public. The commissioner and county appeal.
ISSUES
I. Did the panel err by concluding the county and commissioner did not prove with clear and convincing evidence that Duvall's petition for provisional discharge should be denied?
II. Did the panel make evidentiary errors that warrant reversal?
ANALYSIS
I.
Appellants argue the panel erred by concluding that the county and commissioner did not prove with clear and convincing evidence that Duvall's petition for provisional discharge should be denied. "A person who is committed as a ... person with a sexual psychopathic personality shall not be provisionally discharged unless the committed person is capable of making an acceptable adjustment to open society." Minn. Stat. § 253D.30, subd. 1(a) (2016). In determining whether a provisional discharge is appropriate, the judicial appeal panel must consider the following factors:
(1) whether the committed person's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the committed person's current treatment setting; and
(2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the committed person to adjust successfully to the community.
Id. , subd. 1(b) (2016).
As the person seeking provisional discharge, Duvall had the burden of presenting "a prima facie case with competent evidence to show that the person is entitled to the requested relief." Minn. Stat. § 253D.28, subd. 2(d) (2016). If Duvall meets this burden, then the county and commissioner bear the burden of proving by clear and convincing evidence that the provisional discharge should be denied. Id. The parties stipulated at the judicial-appeal-panel stage that Duvall met his initial burden of presenting a prima facie case with competent evidence that he is entitled to relief. At issue before the panel was whether the county and the commissioner met their burden of proving by clear and convincing evidence that Duvall's petition for provisional discharge should be denied.
A. Continuing Need for Treatment
Appellants first argue that the panel ignored evidence that demonstrated that Duvall has a continuing need for treatment in his current setting, and therefore cannot satisfy Minn. Stat. § 253D.30, subd. 1(b)(1). We review a panel's decision for clear error and examine the record "to determine whether the evidence as a whole sustains the panel's findings." In re Civil Commitment of Kropp , 895 N.W.2d 647, 650 (Minn. App. 2017), review denied (Minn. June 20, 2017). We do not reweigh *893 the evidence. Id. We review questions of statutory construction and the application of statutory criteria to the facts found de novo. Id.
1. Evidence Supporting Panel's Decision
We begin our analysis by discussing the evidence that sustains the panel's finding that Duvall no longer requires treatment in his current setting. See Minn. Stat. § 253D.30, subd. 1(b)(1). Duvall has been in the last stage of the CPS portion of his treatment program since April 2010, where he has lived outside the secure perimeter at the St. Peter MSOP campus. Since leaving the facility, Duvall has not engaged in any behavior that required him to return to MSOP's secured facility. In this last stage of treatment, Duvall is required to abide by his individual treatment plan, maintain a community-based support system, act in a leadership role in the therapeutic community, and prepare for his transition into the community.
The record demonstrates that Duvall has done just that throughout the last several years of his treatment. Duvall engages in supervised off-campus visits multiple times per week. At the hearing, every testifying MSOP employee who accompanied Duvall on community outings testified that Duvall did not engage in problematic behavior while on these outings and did not put himself, the MSOP employees, or the public at risk. The MSOP employees described Duvall as a model client. Duvall has also volunteered at a thrift store for the last eight years. His thrift-store manager described Duvall as respectful, diligent, and reliable. His manager testified that she has never had concerns for her or others' safety while working with him and that he raised the standard for other volunteers.
Duvall has also developed a community support system. Duvall's sponsor from Alcoholics Anonymous testified that he has served as Duvall's sponsor since 2004, Duvall regularly attends meetings, they speak on a regular basis, and he intends to continue as his sponsor if Duvall is provisionally discharged. Duvall has also participated in a community support group called "Choosing Healthy Sexual Boundaries" at Project Pathfinder. A member of the support group testified that Duvall has attended meetings for three years, helps facilitate meetings, and provides positive feedback for other members in the group. In addition, Duvall's brother, Scott Duvall, testified that he speaks to Duvall on a weekly basis and intends on staying in Duvall's life if he is provisionally discharged.
Duvall has also developed leadership roles throughout the MSOP treatment program. Duvall's therapist, Dehrkoop, testified that Duvall acts as a leader inside and outside of the group. Dr. Herbert testified that Duvall provides mentorship to those participating in arousal management, which demonstrates that MSOP trusts him.
Throughout treatment, Duvall has been diagnosed with sexual sadism and antisocial personality disorder, but he has succeeded in following his treatment program. Duvall's therapist, Kristi Mike, testified that Duvall has completed every task that was asked of him throughout treatment. Duvall was required to journal his sexual thoughts and discuss their prevalence in his treatment on a weekly basis. Duvall continued to report his sexual thoughts and fantasies and discuss them during therapy, even though he expressed his desire to stop journaling.
The evidence demonstrates that Duvall continues to experience intrusive and deviant sexual thoughts, but that he has *894 learned how to manage his thoughts. Duvall has taken medication that is typically prescribed to reduce cravings for alcohol and reports that the medication reduces his sexual preoccupation. Throughout therapy, Duvall has also learned the difference between healthy and deviant arousal, completed the "Arousal Management Treatment Programming," and completed a penile plethysmograph evaluation to measure his physical arousal to sexual stimuli. The evaluation did not detect arousal to violence or coercive sexual stimuli involving female adults and teenagers. Duvall testified that he also manages his thoughts through a masturbatory satiation plan, therapy sessions with his MSOP therapist, Alcoholics Anonymous meetings, and his Project Pathfinders support group.
The evidence demonstrates that Duvall succeeded at every stage of MSOP's treatment program. Dr. Herbert testified that Duvall received enhanced to proficient ratings, the two highest available ratings, in the Phase I, II, and III matrix areas in a 2016 sexual violence risk assessment. Dr. Herbert determined that Duvall would need continuing treatment because he was considered a high-risk patient on the Static-99 measurement. She ultimately concluded that Duvall would benefit from receiving community-based treatment so that he could continue working on his needs while being exposed to risk.
The evidence in the record supports the panel's decision that Duvall no longer requires treatment in his current setting. Duvall has achieved the privileges of his current treatment plan, maintained a community-based support system, acted in a leadership role in the therapeutic community, and prepared for his transition into the community. The panel properly concluded that appellants did not clearly and convincingly prove that Duvall requires treatment and supervision in his current treatment setting.
2. Reweighing Evidence
Appellants argue that the panel (1) should have given more weight to the testimony from Dr. Kenning and Dr. Hoberman; (2) should have given less weight to the MSOP employees because they were not Duvall's treatment providers; (3) failed to consider evidence of Duvall's dishonesty; and (4) erroneously considered evidence that was not within the record. In reviewing the panel's order, we will not reweigh the evidence, and "it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary." In the Matter of Commitment of Fugelseth , 907 N.W.2d 248, 253 (Minn. App. 2018) (quotation omitted), review denied (Minn. Apr. 17, 2018).
a. Expert Testimony
Appellants contend that the panel erred by giving less weight to Dr. Kenning's and Dr. Hoberman's testimony because they did not interview Duvall. Dr. Hoberman testified that Duvall would not participate in an interview with him, but Dr. Kenning did not request an interview. Appellants contend that the panel could not consider the experts' inability to interview Duvall in weighing testimony because Duvall refused to be interviewed. To support this argument, appellants cite to In re Matter of Rice , 410 N.W.2d 907, 910 (Minn. App. 1987), review denied (Minn. Oct. 28, 1987). In Rice , this court held that a petition for commitment is not rendered invalid simply because the patient refuses to submit to an examination, so long as the patient's refusal was documented. Id. This court reasoned that "[i]t would be incongruous for us to permit a proposed patient to defeat all commitment proceedings merely by refusing to be examined." Id.
*895 We are not persuaded by appellants' interpretation of Rice . The facts of Rice are unlike the facts here. In Rice , the district court determined that the patient could not avoid a civil commitment proceeding simply by refusing an interview. Id. Here, the state was not prohibited from moving forward in responding to Duvall's discharge petition because he refused an interview. The state was allowed to call Dr. Kenning and Dr. Hoberman, even though they did not interview Duvall.
"This court generally will defer to a district court's evaluation of expert testimony." Fugelseth , 907 N.W.2d at 256 (quotation omitted); see also In re Knops , 536 N.W.2d 616, 620 (Minn. 1995) ("Where the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance."). The panel explained that it must "apply such opinions against the plethora of records reflecting Petitioner's behavioral compliance and reported treatment gains, both within the confines of MSOP and in the community. The evidentiary value of such records and testimony has been given significant weight in this Panel's decision with respect to the statutory elements." The panel discounted Dr. Kenning's opinion that Duvall's transition should be more gradual because it concluded that a more gradual transition was not realistic because Duvall has reached the highest stage of CPS's treatment program. We conclude the panel properly weighed the expert testimony of Dr. Kenning and Dr. Hoberman.
b. MSOP Testimony
Appellants next contend that the "panel further erred by improperly grouping all testifying MSOP employees as members of Duvall's 'treatment team,' when many of these employees were security or other staff not trained in treating or assessing sex offenders." Appellants imply that the panel incorrectly believed all testifying MSOP employees had training in sex-offender treatment. That implication is not supported by the panel's order. In weighing the testimony from various MSOP team members, the panel stated that "while Petitioner's treatment team members are intimately familiar with petitioner's treatment engagement and gains, they are not qualified to provide an opinion on risk. As such, the Panel has assigned credibility and weight to their opinions as professionals with historical knowledge of Petitioner's MSOP treatment progress." The panel specifically articulated that some MSOP team members were not qualified to give an opinion on Duvall's risk level, but it credited their testimony based on their direct familiarity with Duvall throughout his treatment.
c. Relying on Previous Experience
Appellants next argue that the judicial appeal panel improperly relied on its own experience by stating, "MSOP does not have a history of recommending provisional discharge for those who are committed to its treatment program" in its order. Appellants characterize this comment as a judicial finding and contend that the panel gave greater weight to MSOP's views based on its perception that MSOP is generally unsupportive of discharge. Again, this assertion mischaracterizes the panel's order. In analyzing the recommendations from MSOP employees, the panel stated:
MSOP does not have a history of recommending provisional discharge for those who are committed to its treatment program. The panel gives great weight to the MSOP recommendation and support of provisional discharge for Mr. Duvall. The State of Minnesota has created and developed the MSOP treatment program. Petitioner has spent seven years *896 in the last phase of that treatment program. The program now says that Petitioner has done all that he can do at the MSOP program and this Panel give[s] deference to the treatment program's assessment and recommendations.
This language demonstrates that the panel relied on, among other things, the recommendations of MSOP employees because Duvall received treatment in the last stage of MSOP's program for the last seven years. The state designed and oversaw his treatment program, and MSOP employees were well-qualified to discuss Duvall, the treatment, and Duvall's compliance with those program requirements. The panel did comment on MSOP's recommendation history. This was proper and well within the panel's authority. In weighing MSOP's recommendation, the panel thoroughly articulated legitimate reasons for its decision to give deference to MSOP's assessment and recommendations.
d. Dishonesty Evidence
Appellants next argue that the panel did not properly consider evidence of Duvall's dishonesty, particularly his failed polygraph exams and the lie he told Dr. Alsdurf during an interview. Throughout treatment, Duvall was required to participate in polygraph exams that asked questions to determine whether he was completely and transparently reporting his sexual thoughts in his journal. Duvall failed five of the six polygraph exams. In weighing the exams, the panel "recognize[d] that polygraph validity and credibility is not universal among experts and that such assessment methods should be considered in the totality of the circumstances when considering any evidentiary value against the statutory criteria for provisional discharge." The panel also relied on Dr. Herbert's testimony regarding the polygraphs, stating "while the deceptive polygraphs concerned Dr. Herbert and remain a vital focus for treatment providers, she opined that they do not appear to be a measure that should deter [Duvall] from transitioning to a less secure setting." The panel reasoned that:
Whether the deceptive polygraphs are the result of actual deceit by [Duvall], minimization of his deviant thoughts, minimization of his reaction to the deviant thoughts, unfair administration of the exam or stress from the ongoing legal proceeding, the deceptive polygraphs alone are not sufficient to preclude provisional discharge. Petitioner can obtain the necessary treatment to address these issues in an outpatient setting or by returning for treatment sessions at the MSOP campus if outpatient providers are unable to provide the necessary treatment.
The panel did not view Duvall's history of deceit in isolation, as appellants suggest. Instead, the panel carefully weighed the evidence of Duvall's lack of transparency against the majority of evidence that supported his release. The panel reasoned that Duvall's deceit to Dr. Alsdurf, the failed polygraphs, and his deviant sexual thoughts did not outweigh the evidence showing that Duvall
demonstrated he can control his behavior and comply with rules and expectations of MSOP while residing outside the secure perimeter on the St. Peter Campus and while on escorted outings in the community. He has been successful in the reintegration phase of the treatment program for seven years. Petitioner has achieved all privileges commensurate with his treatment status. ... It is unclear how Petitioner's reintegration into the community could be more gradual to satisfy Dr. Kenning's concern since his placement at CPS does not provide any additional opportunities for Petitioner to *897 demonstrate his ability to successfully adjust to the community.
Appellants' argument simply goes to their claim that the evidence should have been weighed differently, but we do not reweigh the evidence. Fugelseth , 907 N.W.2d at 253. The panel did not err in determining that Duvall's overall success in treatment outweighs the evidence of Duvall's dishonesty.
B. Providing Reasonable Degree of Protection to the Public
Appellants next argue that the provisional discharge plan did not provide a reasonable degree of protection to the public under Minn. Stat. § 253D.30, subd. 1(b)(2). On appeal, we do not consider whether the record could support a finding that the provisional discharge plan does not provide a reasonable degree of protection to the public. Instead, we consider whether the judicial appeal panel clearly erred by finding that the plan provides a reasonable degree of protection to the public. C.f. Fugelseth , 907 N.W.2d at 256 ("The question is not whether the record could support a finding that [a committed person] still is dangerous to the public; the question is whether the judicial appeal panel clearly erred by finding [the committed person] no longer is dangerous to the public.").
Christopher Onken, the owner of Zumbro House, Inc., confirmed that Duvall is welcome at Zumbro House and that the facility is equipped to meet Duvall's needs. Onken testified that Zumbro House provides twenty-four hour staff and a secured facility. Dr. Herbert testified that the proposed treatment setting would provide adequate supervision and ongoing care for Duvall because it included sex-offender treatment from licensed state officials and accounts for the sexual boundaries support group, Alcoholics Anonymous, and his personal support network. Dr. Herbert testified that under the provisional discharge plan, Duvall would also be required to check-in with staff members and wear a global positioning system (GPS) monitor. She discussed that she has no reason to believe that Project Pathfinder cannot provide the requisite treatment to Duvall to meet his needs and ultimately opined that Duvall satisfies the statutory requirements for provisional discharge from civil commitment. This testimony demonstrates that the record as a whole supports the panel's determination that the provisional discharge plan will provide a reasonable degree of protection to the public and will enable Duvall to adjust successfully to the community, meeting Minn. Stat. § 253D.30, subd. 1(b)(2) requirements.
Appellants contend that Duvall's discharge plan is inadequate because it does not account for his high risk of recidivism and does not specify an outpatient treatment provider or identify his specific residence location. Appellants first contend that the discharge plan does not provide a reasonable degree of protection to the public because Duvall "poses an exceptionally high risk of [re-offending]." The panel made multiple factual findings acknowledging Duvall's risk of recidivism. It properly considered Dr. Herbert's testimony that Duvall's community-based treatment at Project Pathfinder and interaction with his vocational supervisors would assist him in avoiding recidivating. The panel was persuaded because the provisional discharge plan provided for GPS monitoring, 24-hour supervision from staff at his residence, and restrictions preventing Duvall from leaving his residence unless accompanied by MSOP staff and with approval from MSOP's reintegration director. The record supports the panel's decision that the provisional discharge plan provides a reasonable degree of protection to the public.
*898 Appellants next argue that the plan fails to identify a specific treatment center and does not identify his specific housing address. That is incorrect. The provisional discharge plan states that Duvall will be released to a setting "that will include, at least initially, 24 hour staffing and cameras in common areas." Onken testified that Zumbro House has accepted him and plans on placing Duvall in its supported apartment facility, but simply has not yet assigned Duvall to a specific apartment. All that is left is to determine "apartment 101" rather than "apartment 102." Appellants try to argue that Project Pathfinder will not provide adequate treatment for Duvall. To the contrary, Onken testified that MSOP discussed with him that Project Pathfinder may serve as his treatment provider if he was provisionally discharged, and a member of Project Pathfinder testified that Duvall has expressed a desire to continue treatment with the group. Additionally, Dr. Herbert testified that "the identified placement at Project Pathfinder[ ] would be suitable to provide him with the treatment that he needs ... [and] [h]e would have other types of supportive services that are certainly important as well." Even Dr. Alsdurf acknowledged that Project Pathfinder would be willing to provide outpatient therapy for Duvall. The evidence in the record easily demonstrates that the provisional discharge plan will provide an effective outpatient therapy program at Project Pathfinder. The judicial appeal panel did not err in determining that Duvall's provisional discharge plan provides a reasonable degree of protection to the public and will allow Duvall to adjust successfully to the community. Minn. Stat. § 253D.30, subd. 1(b)(2).
II.
Appellants next argue that the panel improperly excluded victim testimony and that this error prejudiced appellants' ability to demonstrate Duvall's sexual sadism. At the hearing, the commissioner moved to amend its witness list so that it could call a former victim to testify about Duvall's sexual assaults. The panel denied the motion and determined that the victim's testimony would not be relevant to the provisional discharge statute under Minn. Stat. § 253D.30, subd. 1. The panel instead allowed the victim to submit a written impact statement under Minn. Stat. § 253D.14, subd. 3 (2016), which provides that a victim has the "right to submit a written statement regarding decisions of the executive director, or special review board," for an offender requesting provisional discharge. The panel reasoned that it was not aware of even one case where a victim testified in a provisional discharge hearing. The panel determined the prejudicial effect of the victim's testimony would exceed the probative value, particularly because of media attention to the case.
Appellants argue that the panel abused its discretion by not allowing the victim to testify. "The decision of whether to admit or exclude evidence is within the district court's discretion and will be reversed only if the court has clearly abused its discretion." In re Civil Commitment of Ramey , 648 N.W.2d 260, 270 (Minn. App. 2002). Here, the panel was required to determine whether Duvall required treatment in his current setting and whether the proposed discharge plan would adequately protect the public. See Minn. Stat. § 253D.30, subd. 1(b). The panel did not abuse its discretion by prohibiting a victim from testifying in person about a crime from thirty years ago in a hearing dedicated to determining whether Duvall requires treatment in his current setting.
*899 Appellants allege that the panel's decision prohibiting the victim from orally testifying prevented appellants from fully proving the nature of Duvall's sexual sadism. This assertion is not supported by the record and is rejected. The panel allowed the victim to submit a victim impact statement. Multiple witnesses thoroughly explained Duvall's diagnosis of sexual sadism, including Dr. Herbert, Dr. Kenning, Dr. Alsdurf, and Duvall's therapists.
DECISION
After reviewing the record as a whole, we conclude the evidence overwhelmingly supports the panel's decision that appellants did not meet their burden of showing by clear and convincing evidence that the discharge should not have been granted. We affirm the panel's order.
Affirmed.

Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

A person committed as a sexually dangerous person or a person with a sexual psychopathic personality must first seek provisional discharge through a special review board (SRB). Minn. Stat. § 253B.18, subd. 7 (2016). Any aggrieved party may petition the SRB within seven days to review the revocation. Minn. Stat. § 253B.18, subd. 13 (2016). If an aggrieved party petitions the SRB, the SRB shall "review the circumstances leading to the revocation and shall recommend to the commissioner whether or not the revocation shall be upheld." Id. To challenge a recommendation of the SRB, the committed person or the commissioner may petition the judicial appeal panel (SCAP) for a rehearing and reconsideration of the SRB's recommendation. See Minn. Stat. § 253D.28, subd. 1(a) (2016). The judicial appeal panel consists of three judges appointed from acting judges of the state. See Minn. Stat. § 253B.19 (2016). "A party aggrieved by an order of the appeal panel may appeal from the decision of the appeal panel to the Court of Appeals as in other civil cases." Id. , subd. 5.