In re David A. DIRKS.

No. C2–94–2200.

Court of Appeals of Minnesota.

March 14, 1995.

Ronald L. Greenley, Nicol & Greenley, Ltd., Anoka, for appellant Dirks.

Robert M.A. Johnson, Anoka County Atty., Paul C. Clabo, Asst. County Atty., Anoka, for respondent County.

Considered and decided by NORTON, P.J., and PETERSON and MANSUR, JJ.

## OPINION

MARTIN J. MANSUR, Judge.*

Appellant stipulated to his initial commitment as mentally ill and dangerous to the public. After the security hospital filed its report, a review hearing was held. The trial court concluded appellant was chemically dependent and continued to be mentally ill and dangerous to the public. It committed appellant to the Minnesota Security Hospital for an indeterminate period. David Dirks appeals; we affirm.

## FACTS

After appellant went on a "rampage" at the house in which he was living, and attempted suicide by shooting himself in the chest, a social worker filed a petition for his commitment as mentally ill and dangerous and chemically dependent. A hearing was held, and the trial court committed appellant to the Minnesota Security Hospital as mentally ill and dangerous pursuant to stipulation.

The security hospital filed a report. Appellant was diagnosed with bipolar mood disorder, in remission, and alcohol dependence syndrome. The hospital reported that because appellant took medication and abstained from alcohol while at the hospital, his symptoms were largely in remission and he was not assaultive or threatening. The report recommended treatment at a facility designed to treat mental illness and chemical dependency. Because the security hospital does not provide formal chemical dependency treatment, it was not considered the best

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

treatment alternative. Finally, the report concluded that appellant's commitment as mentally ill and dangerous should be continued, based on his history of physical violence, to provide motivation to comply with treatment recommendations, and to expedite a return to a secure facility should appellant fail to comply with treatment.

A review hearing was held. The court found appellant physically assaulted and threatened girlfriends, family members, and law enforcement officers. He made death threats directed at various individuals and his assaultive behavior resulted in criminal assault charges and restraining orders.

The court also made findings as to testimony by Lynn Barager, appellant's former housemate, in which she described a rampage appellant went on in her home in early April. While appellant denied and minimized Barager's account of the events, he admitted shooting her cat and shooting himself. The court found Barager's account was corroborated by the police reports, which described bullet holes in the living room, basement, and bedroom walls of her home, broken dishes and furniture, and upset plants and flower pots throughout the house. The police reports indicated that Barager had a black eye at the time of the investigation. The court found that whether or not the physical assault on Barager was on the whole as she described it, it evidenced the danger appellant posed to her and others. It found that appellant's discharge of firearms as part of a rampage of the house posed a substantial likelihood of physical harm to Barager and others.

Appellant suffers from a bipolar mood or affective disorder, an antisocial personality disorder and chemical dependency. Dr. James Gilbertson, a licensed psychologist and court-appointed examiner, and Kenneth Martens, a psychologist at the security hospital, testified appellant is largely in remission from the bipolar disorder due to medication. He continues to display some symptoms of mood instability, anger, and control and behavior problems, and recently was involved in an altercation with another patient, and also broke a window. Without the structure of the hospitalization and medication, his pri-

or symptoms would recur, and he would be likely to start drinking and unlikely to continue with his medication and therapy. Dr. Gilbertson believed security could be guaranteed only with a commitment as mentally ill and dangerous. Likewise, Martens testified that without such a commitment, appellant's mental illness posed a substantial likelihood of harm to others.

The court was presented with extensive testimony as to treatment options. Dr. Gilbertson testified that the ideal placement would be a secure combined mental illness/chemical dependency unit, but no such facility exists in Minnesota. He recommended treatment at a secure unit on a regional treatment center campus with a mentally ill and dangerous commitment. If appellant were committed to the security hospital, special arrangements would have to be made to provide him with chemical dependency treatment.

Martens testified that the hospital staff recommended commitment to a locked chemical dependency unit where appellant's medication and blood levels could be supervised. Appellant's mental illness is sufficiently in remission so that his treatment can focus on chemical dependency. Anoka Metro Regional Treatment Center was one option, although Martens was unaware of its security provisions. Fergus Falls Regional Treatment Center, which has a locked chemical dependency unit, as well as psychiatric staff to monitor medication, was another option. If appellant were committed directly to the security hospital, he would be moved from the evaluation/assessment unit to a treatment unit. Staff would monitor his mental illness improvement and prepare him for chemical dependency treatment. If his mental illness continued to be in remission, the hospital would petition the special review board for transfer to Anoka or Fergus Falls.

Dennis Larson, a social worker at the security hospital, testified that if appellant were committed directly to the security hospital, he could petition the special review board for transfer after six months, or the security hospital could initiate a transfer sooner. If the transfer were to occur, a very specific discharge plan would provide condi-

tions by which appellant would have to abide, and violation of these conditions could lead to revocation and transfer back to the security hospital. If appellant were committed directly to Fergus Falls or Anoka, no such discharge plan would be developed. Larson was unable to recommend whether appellant should be committed directly to Fergus Falls or Anoka, or whether he should be committed to the security hospital and then ultimately be transferred to another facility through the special review board.

Jeffrey Cheyne, a social worker with Anoka County Social Services, testified that while Anoka has a locked unit, it is not very secure. Appellant's chemical dependency needs could be met at the locked Fergus Falls chemical dependent unit, but to obtain mental illness treatment there he would have to be transferred from the locked unit for some of the time. To treat mental illness and chemical dependency and provide the necessary security, Cheyne believed appellant should remain at the security hospital. Appellant could receive chemical dependency treatment by being escorted to the St. Peter Regional Treatment Center campus.

The trial court committed appellant as chemically dependent. It also committed him for an indeterminate period to the security hospital as mentally ill and dangerous.

David Dirks appeals. He challenges his commitment as mentally ill and dangerous, and contends he should be committed only as mentally ill and chemically dependent.

## ISSUES

1. Did the trial court have clear and convincing evidence to commit appellant as mentally ill and dangerous?

2. Did the trial court have clear and convincing evidence to determine that the Minnesota Security Hospital was the least restrictive treatment alternative for appellant?

## ANALYSIS

1. The trial court committed appellant for an indeterminate period as mentally ill and dangerous. Minn.Stat. § 253B.18, subd. 3 (1994). Commitment as mentally ill and dan-

gerous requires a determination that the person is mentally ill and presents a clear danger to the safety of others. Minn.Stat. § 253B.02, subd. 17 (1994). The latter requires a showing that:

(i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

*Id.,* subd. 17(b).

The trial court found appellant engaged in overt acts causing or attempting to cause physical harm to others when he physically assaulted and threatened girlfriends, family members, and law enforcement officers. It specifically found his discharge of firearms as part of the rampage posed a substantial likelihood of physical harm to Barager and others.

Appellant argues that the overt act requirement of section 253B.02, subdivision 17(b)(ii) was not met. While acknowledging he committed inappropriate acts in the past, he notes they occurred before he was receiving medication and while he was still drinking. He argues that his suicide attempt cannot be used to meet the overt act requirement because he did not cause or attempt to cause serious physical harm to another.

The fact that the incidents occurred when appellant was experiencing the symptoms of his mental illness, and while he was drinking and before he was on medication, does not lessen their importance. Instead, it shows the necessity for the commitment. Appellant's actions in discharging the firearm in the house and the other assaults meet the overt act requirement of causing or attempting to cause serious physical harm to another. *See* Minn.Stat. § 253B.02, subd. 17(b)(i); *In re Jasmer,* 447 N.W.2d 192, 196 (Minn. 1989) (shooting gun towards boy from distance of 65 to 80 feet but missing him constitutes overt act causing or attempting to cause harm).

Appellant also argues that the evidence does not show he is likely to engage in any acts capable of inflicting serious physical harm on another, because his mental illness

is in remission as long as he continues to take his medication. Minn.Stat. § 253B.02, subd. 17(b)(ii).

■ "Dangerousness may be demonstrated by past conduct together with a determination the person is likely to engage in future violent conduct." *In re Lufsky,* 388 N.W.2d 763, 766 (Minn.App.1986). Where the patient is symptom-free while hospitalized and receiving medication, the court may consider precommitment dangerous behavior. *In re Malm,* 375 N.W.2d 888, 891 (Minn.App.1985).

The trial court found that appellant's dangerous behavior and psychiatric symptoms have been largely brought under control due to a combination of the medication, group and milieu therapy, and the secure controlled structure at the security hospital that discourages aggressive behavior. However, the court cited the testimony by the experts that it was unlikely appellant would continue to take his medications or obtain treatment outside of the hospital setting, and absent medication, other forms of therapy, and the controlled hospital environment, it was highly likely he would return to his out-of-control, dangerous behavior. *Id.* It noted that appellant, while admitting he is mentally ill, has only marginal insight and does not appreciate how it affects his behavior or the necessity for treatment, blaming his problems on chemical dependency, and found no assurance that appellant would not abscond from an open hospital.

Appellant is continuing to experience residual symptoms, and has been involved in an altercation with another patient and a rock throwing episode while at the security hospital. The medical opinion is united that appellant continues to be dangerous as well as mentally ill. The experts predicted that appellant, if free from the structure and supervised environment of the security hospital, would cease to take his medication, begin consuming alcohol, and return to his dangerous behavior. In light of these undisputed facts, there was clear and convincing evidence to show a substantial likelihood that appellant would engage in acts capable of inflicting serious physical harm on another. *Id.;* Minn.Stat. § 253B.02, subd. 17(b)(ii).

2. Appellant also challenges his placement at the security hospital, contending it is not the least restrictive alternative available to meet his treatment needs.

If the court finds at the review hearing that the patient continues to be mentally ill and dangerous, the court shall order commitment of the proposed patient for an indeterminate period of time. Minn.Stat. § 253B.18, subd. 3. The special security concerns in mentally ill and dangerous commitments are well recognized. *See Lidberg v. Steffen,* 514 N.W.2d 779, 784 (Minn.1994) (state owes community higher degree of protection from someone committed as mentally ill and dangerous than as mentally ill). The burden of proof is on the proponent of commitment to establish by clear and convincing evidence that "[t]here is no appropriate less restrictive alternative available." Minn. R.Civ. Commitment 12.06(b); *In re Schauer,* 450 N.W.2d 194, 198 (Minn.App.1990).

■ Where a district court is presented with conflicting expert testimony as to the patient's treatment, the discretion accorded to the district court takes on special significance, and will not be reversed unless clearly erroneous. *In re Kellor,* 520 N.W.2d 9, 12 (Minn.App.1994), *pet. for rev. denied* (Minn. Sept. 28, 1994).

■ In this case, appellant's treatment placement was problematic because there was no facility which was sufficiently secure and provided both chemical dependency and mental illness treatment. The trial court was presented with various recommendations, and in a thoughtful analysis of the evidence, determined that appellant should be committed to the Minnesota Security Hospital. It recognized that the best treatment was found at the open hospitals, but that those programs do not provide adequate security. The court found that if committed to the security hospital, appellant could receive adequate chemical dependency counseling of a more limited preparatory nature until he progresses to a security level which would allow him to be escorted to the St. Peter open hospital for more intense chemical dependency treatment or until he can be transferred to another open hospital for treatment. Further, appellant could receive in-

tensive mental illness treatment while at the security hospital.

Appellant argues the evidence showed that his primary treatment need was for chemical dependency treatment, which the security hospital does not offer, and that the security hospital is not the least restrictive treatment program which can meet his treatment needs. He contends that even if the court were to consider a reasonable degree of safety for the public, it would be an abuse of discretion to place the safety of the public above the concerns for treatment of appellant.

This court has recognized the need for the structure and security provided by the security hospital for mentally ill and dangerous patients. *See In re Clemons*, 494 N.W.2d 519, 521–22 (Minn.App.1993) (security hospital placement appropriate to address unique aspects of assault and concerns as to continued mental illness, possible episodic alcohol use, and uncertain medication compliance); *Schauer*, 450 N.W.2d at 198 (security hospital provided closer supervision and tighter security, while meeting patient's treatment needs, than Veterans Hospital). The trial court in its well-reasoned and thoughtful findings provided the rationale for its decision, and its decision is supported by the evidence and is not clearly erroneous.

## DECISION

The trial court decision to commit appellant to the Minnesota Security Hospital as chemically dependent and for an indeterminate period as mentally ill and dangerous is affirmed.

**Affirmed.**