*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1702**

In the Matter of the Civil Commitment of: Ingram Oyugi.

**Filed May 6, 2024**
**Affirmed**
**Smith, Tracy M., Judge**

Hennepin County District Court
File No. 27-MH-PR-23-632

Thomas Hagler, St. Paul, Minnesota (for appellant Ingram Oyugi)

Mary F. Moriarty, Hennepin County Attorney, Annsara Lovejoy Elasky, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Attorney's Office)

Considered and decided by Smith, Tracy M., Presiding Judge; Bratvold, Judge; and

Jesson, Judge.*

**NONPRECEDENTIAL OPINION**

**SMITH, TRACY M.**, Judge

After being found incompetent to proceed on various criminal charges, appellant

Ingram Oyugi was indeterminately committed as a person with mental illness who is

dangerous to the public (MI&D) pursuant to Minnesota Statutes section 253B.18 (2022).

Oyugi challenges the indeterminate commitment, arguing that the district court erred by

(1) concluding that Oyugi engaged in overt acts capable of causing or attempting to cause

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

serious physical harm to another, (2) concluding that Oyugi was indeterminately committable because he continued to meet the definition of a person who is MI&D and no less restrictive alternative was available, and (3) admitting and considering certain hearsay evidence and expert witness testimony. We affirm.

## FACTS

**Mental Health and Commitment History**

Oyugi was first hospitalized for psychiatric concerns in 2019. Between 2019 and 2022, he was hospitalized five times after engaging in behaviors dangerous to himself and others, including erratic driving, physically attacking his sister in 2020, wandering in traffic, and exhibiting symptoms of psychosis. During his hospitalizations, he repeatedly refused to engage meaningfully with staff, acknowledge his mental illness, and take prescribed medications. During this time, civil commitment as a person who poses a risk of harm due to mental illness (MI&H) was pursued but stayed.

**Underlying Criminal Proceedings**

On April 11, 2023, and April 21, 2023, two incidents allegedly occurred that led to Oyugi being charged with several criminal offenses.

In the days leading up to the April 11 incident, officers were twice dispatched to Oyugi's residence—once on April 7 and again on April 9. On April 7, officers observed Oyugi walking around the home with a baseball bat. On April 9, when officers returned to the home, Oyugi, according to their report, "retreated back into the home and armed himself with a bat" when they approached.

On April 11, Oyugi's mother and sister told Oyugi that they were gathering some belongings so they could leave the residence. According to the women, Oyugi started to yell, pulled a can of bear mace from a pouch on his hip, and sprayed them in the face with the mace. When officers arrived in response to a call, they found the women crawling around in pain on the driveway. The women's eyes were closed and difficult to open, and their faces were red. The women reported that they were terrified to return home because, every time they did, Oyugi became upset and violent. Oyugi refused to exit the home, and the officers left Oyugi after determining that they would make an attempt to aid at a later point in time. Oyugi was charged with two counts of misdemeanor domestic assault and one count of misdemeanor disorderly conduct related to this incident.

On April 21, officers were called to the home to assist with serving an ex parte order for protection against Oyugi. After attempting to coax Oyugi outside over the phone, officers entered the home and heard him yelling from downstairs. Officers told Oyugi that they had a court order requiring him to leave the residence, and Oyugi sprayed an aerosol substance up the stairwell. Officers were forced to use gas masks to prevent them from being contaminated by the spray as they continued in their efforts to contain Oyugi. Additionally, Oyugi launched two taser probes at an officer, who was struck but not injured. Officers tried to negotiate with Oyugi for several hours.

Oyugi was eventually detained and brought to the hospital. At the hospital, he presented with "grossly psychotic symptoms and violent thoughts." He was later discharged to the county jail with a prescription for medication. He was charged with one felony count of using tear gas to immobilize, one felony count of fourth-degree assault of

a peace officer, and one gross-misdemeanor count of using tear gas or stun gun on a peace officer in relation to the April 21 incident.

**Competency and Civil Commitment**

In May 2023, Oyugi was found incompetent to proceed on all pending criminal charges pursuant to Minnesota Rule of Criminal Procedure 20.01. He was then referred for civil commitment. Respondent Hennepin County filed a petition seeking to civilly commit Oyugi as MI&D for an indeterminate amount of time. The district court appointed Hennepin County Psychological Services to examine Oyugi, draft a report, and provide an opinion. Mallory Jorgenson, Ph.D., LP, was appointed, reviewed Oyugi's records, and drafted a report.

The initial commitment hearing was held on July 11, 2023. At the initial hearing, the district court received numerous exhibits offered by the county and heard testimony from Dr. Jorgenson, Oyugi's mother, and Oyugi. On July 20, 2023, the district court filed an order committing Oyugi as MI&D to the Forensic Mental Health Program (FMHP)[1] pursuant to Minnesota Statutes section 253B.18, subdivision 1(a).

In August 2023, a *Jarvis* hearing was held, during which Oyugi testified.[2] The district court subsequently issued a *Jarvis* order authorizing the administration of neuroleptic medications without Oyugi's consent.

---

[1] FMHP was formerly known as the Minnesota Security Hospital.

[2] *Jarvis* refers to *Jarvis v. Levine*, in which the Minnesota supreme court held that health-care professionals must obtain court approval before treating a patient with neuroleptic medications without the patient's consent. 418 N.W.2d 139, 150 (Minn. 1988). A "*Jarvis*

In September 2023, Meagan McKenna, Psy.D., LP, from the FMHP provided the district court with a 60-day report pursuant to Minnesota Statutes section 253B.18, subdivision 2(a). A hearing was held on September 28, 2023, to determine whether Oyugi continued to be indeterminately committable. *See* Minn. Stat. § 253B.18, subd. 2(a) (requiring the district court to hold a review hearing "to make a final determination as to whether the patient should remain committed as a person who [is MI&D]"). At the hearing, the court received additional exhibits offered by the county and heard testimony from Dr. McKenna and Oyugi's mother. On September 29, 2023, the district court issued an order committing Oyugi for an indeterminate period of time pursuant to Minnesota Statutes section 253B.18, subdivision 3.

Oyugi appeals.

## DECISION

**I.    The district court did not err by concluding that Oyugi engaged in overt acts causing or attempting to cause serious physical harm to another.**

Oyugi first challenges the district court's initial commitment determination. He argues that the district court erred by concluding that he engaged in overt acts causing or attempting to cause harm as required by Minnesota Statutes section 253B.02, subdivision 17(2)(i) (2022), because his actions did not rise to the level of "serious physical harm." We disagree.

---

hearing" and "*Jarvis* order" refer to the procedures for court approval for administration of neuroleptic medication without a patient's consent.

Whether Oyugi's actions constitute "overt acts causing or attempting to cause serious physical harm" within the meaning of the statute is a question of statutory application that this court reviews de novo. *See In re Civ. Commitment of Kropp*, 895 N.W.2d 647, 650 (Minn. App. 2017), *rev. denied* (Minn. June 20, 2017).

There is no statutory definition of "serious physical harm," but appellate courts have ascertained its meaning. Appellate courts apply the common understanding of the word "serious." *In re Lufsky*, 388 N.W.2d 763, 766 (Minn. App. 1986). Not every physical consequence of every assault is "serious," and courts must observe the distinction between "physical harm" in the definition of a person who is MI&H and "serious physical harm" in the definition of a person who is MI&D. *See In re Kottke*, 433 N.W.2d 881, 884 (Minn. 1988); *see also* Minn. Stat. § 253B.02, subds. 17, 17a (2022). The person need not intend to cause harm or actually cause harm for the conduct to meet the overt-act requirement. *See In re Jasmer*, 447 N.W.2d 192, 195-96 (Minn. 1989). And it is not necessary that "mayhem or murder" occur; less violent conduct may meet the statutory requirement. *Kottke*, 433 N.W.2d at 884.

In its conclusions of law, the district court cited the April 11, 2023 incident—during which Oyugi allegedly sprayed his mother and sister in the face with bear mace—and the April 21, 2023 incident—during which he allegedly used mace and a taser to attack law enforcement—as the overt acts causing or attempting to cause serious physical harm.[3]

---

[3] We note that Oyugi argues that the evidence of the 2020 incident, in which he attacked his sister, was not clear and convincing. But, while the district court described this incident in its findings of fact, it did not conclude that it constituted one of the overt acts. And Oyugi's argument regarding the 2020 incident does not persuade us that his 2023 actions

6

Oyugi contends that his actions do not rise to the level of serious physical harm contemplated by the statute because they are analogous to actions that were found to be insufficient to commit an individual as MI&D in *Kottke*. There, Kottke was charged with two counts of misdemeanor assault for: (1) striking a security guard with a closed fist while being escorted from a building, leaving red marks on the guard's face, and (2) striking a loss-prevention officer on the back with both fists, causing the loss-prevention officer to fall and sprain his thumb. *Id.* at 882. The supreme court concluded that Kottke's conduct "neither inflicted nor was intended to inflict the serious physical harm of the type contemplated by the statute" and therefore the evidence of the assaults was insufficient to establish that Kottke was MI&D. *Id.* at 884. Kottke was described as "extremely mild-mannered," and his assaults were described as striking out "in a rather ineffectual way." *Id.* at 883. He had no history of similar behavior. *Id.*

Oyugi argues that, under *Kottke*, "only extreme acts of violence satisfy the statutory requirement of serious physical harm" and that his act of spraying his mother and sister with bear mace does not rise to the level of causing the serious physical harm contemplated by the statute. He also asserts that his act of spraying his mother and sister with bear mace does not satisfy the statute because, like the acts in *Kottke*, that act only amounted to alleged misdemeanor assault. He makes a similar argument regarding his actions of using mace and a taser against police because, he contends, those actions would have resulted in misdemeanor charges had the victims not been police officers.

---

of spraying his mother, sister, and police with chemical irritants and firing a taser at police were not overt acts causing or attempting to cause serious harm.

7

We disagree that Oyugi's acts are not sufficiently serious to satisfy the statutory requirement under *Kottke*. Oyugi's act of spraying bear mace directly into the face of his mother and sister rises to a higher level of physical harm than striking individuals with fists in a "rather ineffectual way." *See id.* While the security guard in *Kottke* suffered red marks on his face and the loss-prevention officer suffered a sprained thumb after falling, Oyugi's mother and sister experienced pain that Oyugi's mother described as "excruciating" from being sprayed in the face with bear mace. When police arrived at the home, both women were crawling around on the driveway with their eyes closed and difficult to open. Their faces were also red. And, had Oyugi successfully maced the officers without their protective equipment on, they too could have suffered the same level of harm. In other words, regardless of the outcome of spraying the officers, the potential for harm was the same.

Nor are we persuaded by Oyugi's attempt to draw a rule from *Kottke* that distinguishes between acts resulting in misdemeanor charges and acts resulting in felony charges. What matters is the seriousness of the physical harm based on the facts, not the level of criminal charges that might result.

We conclude that, consistent with *Kottke*, Oyugi's actions in the April 11 and April 21 incidents constitute overt acts causing or attempting to cause serious physical harm.

Our conclusion is bolstered by our nonprecedential decision in *In re Tempel*, No. C8-94-807, 1994 WL 468113 (Minn. App. Aug. 30, 1994), *rev. denied* (Minn. Oct. 27, 1994), which both parties cite. Nonprecedential opinions "are not binding authority except

as law of the case, res judicata or collateral estoppel" but "may be cited as persuasive authority." Minn. R. Civ. App. P. 136.01, subd. 1(c).

In *Tempel*, we concluded that Tempel engaged in an overt act causing serious physical harm when he reached behind his back, pulled out a can of mace, and sprayed his caretaker in the eyes. 1994 WL 468113, at *1, *4. We stated that "[s]praying mace into a person's eyes is inherently dangerous" and concluded that "[Tempel's] conduct me[t] the standard for commitment as mentally ill and dangerous even if he did not inflict or intend to inflict serious physical harm." *Id.* at *4.

Oyugi argues that *Tempel* is distinguishable because Tempel had a gun, was charged with a felony, threatened to kill the victim, and sprayed tear gas directly into the victim's eyes at close range. *See id.* at *1. We are not persuaded. First, we did not consider the fact that Tempel had other weapons in his possession when concluding that the act of spraying an individual in the eyes with mace met the "serious physical harm" requirement. *See id.* at *4. Further, we concluded that the record did not support the district court's finding that Tempel threatened to kill the victim, and therefore that was not a fact considered in our analysis. *See id.* at *2. Second, the level of charges is not dispositive. And third, as the county points out, Oyugi's characterization of his actions as "not intentionally" spraying his mother and sister directly in the eyes is irrelevant. A person need not intend to cause harm or actually cause harm for the conduct to meet the overt-act requirement. *Jasmer*, 447 N.W.2d at 195-96.

The facts here are analogous to those in *Tempel*. And, although *Tempel* is a nonprecedential decision, we consider it persuasive authority in resolving the issue of whether Oyugi's actions rise to the level of "serious physical harm" required by the statute.

Finally, Oyugi argues that his actions do not meet the statutory criteria because bear spray, mace, and tasers are legal to purchase and possess; the use of chemical irritants in an inappropriate manner is a misdemeanor; and the statute criminalizing the inappropriate use of chemical irritants does not include the "serious physical harm" language. These points are not persuasive. An ordinarily nonlethal object that is legal to purchase may pose a risk of "serious physical harm" to others when used improperly, and Oyugi does not provide a compelling reason to conclude otherwise. Similarly, neither the fact that the chemical-irritant statute criminalizes inappropriate use as a misdemeanor nor the fact that the statute does not use the phrase "serious physical harm" means that inappropriate use of a chemical irritant could not result in serious physical harm—it only means that serious physical harm is not required to prosecute it as a crime.

The district court did not err by concluding that Oyugi engaged in overt acts causing or attempting to cause serious physical harm to another.

## II. The district court did not err by concluding that Oyugi is indeterminately committable.

Before indeterminately committing an individual as MI&D following an initial commitment determination, the court must hold a second hearing and must determine that the patient continues to meet the statutory MI&D criteria. Minn. Stat. § 253B.18, subds. 2, 3. Oyugi argues that the evidence does not establish that he continued to meet the statutory

10

criteria for indeterminate commitment because (1) he did not meet the definition of MI&D because he was not substantially likely to cause serious harm in the future and (2) a less restrictive alternative existed. Whether clear and convincing evidence supports the district court's determination that Oyugi continued to meet the statutory criteria for indeterminate commitment as MI&D is a question of law that we review de novo. *See In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003).

### A.    Future Risk of Serious Harm

Oyugi argues that the evidence is insufficient to establish that he was substantially likely to cause serious harm in the future for two reasons. *See* Minn. Stat. § 253B.02, subd. 17(2)(ii) (defining MI&D to require that "there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another").

First, Oyugi argues that the evidence is insufficient because, at the August 2023 *Jarvis* hearing, Oyugi told the district court "that he understood that he was sick, that he needed help, and that he wanted to continue his medication." This argument is not persuasive. A review of the testimony elicited at the *Jarvis* hearing reveals that, while Oyugi said at one point that he was ill, that he needed help, and that he needed medication, he contradicted himself moments later by asserting that he did not need medication and that he was perfectly healthy.

Second, Oyugi argues that the evidence is insufficient because the district court erroneously disregarded the fact that he was not violent during his confinement and that he had not recently committed overt acts of violence. This argument is also not persuasive. The district court considered Oyugi's nonviolence while confined and recent lack of overt

11

acts but determined that there was still clear and convincing evidence that he remained a serious danger to others. The district court made numerous findings related to the risk of future harm that Oyugi posed, including findings of a pattern of escalating behavior, Oyugi's noncompliance with treatment, his limited understanding of his mental illness and his treatment needs, and his failure to develop coping strategies to manage his anger and impulse reactions. These findings are supported by Dr. McKenna's testimony and report, which the district court found credible and persuasive. Clear and convincing evidence supports the district court's determination that Oyugi continues to be dangerous to the public.

Further, a lack of recent overt acts does not preclude a finding of continued dangerousness, and good behavior in an artificial environment—like jail—is not determinative of whether an individual poses a risk of future harm. *See In re Irwin*, 529 N.W.2d 366, 374 (Minn. App. 1995), *rev. denied* (Minn. May 16, 1995). Here, expert testimony that Oyugi continued to be mentally ill and dangerous to the public is sufficient to support the district court's conclusion, despite Oyugi's good behavior in jail. *See id.* (upholding initial and indeterminate commitments as MI&D when the committed person refrained from engaging in overt acts while in prison, but experts testified that the committed person remained MI&D).

## B. Less Restrictive Alternative

Oyugi argues that the district court erred by finding that a less restrictive alternative does not exist because his mother testified that he could be treated at a less restrictive facility like Anoka Metro Regional Treatment Center (AMRTC).

Upon a finding that a person is MI&D, a district court must commit the individual to a secure treatment facility unless there is a less restrictive state-operated treatment program or facility available that is consistent with the patient's treatment needs and the requirements of public safety. Minn. Stat. § 253B.18, subd. 1(a). The committed person has the burden of proving by clear and convincing evidence that a less restrictive alternative exists. *In re Civ. Commitment of Ince*, 847 N.W.2d 13, 25 (Minn. 2014). The district court's finding as to the least restrictive alternative will not be reversed unless it is clearly erroneous. *In re Dirks*, 530 N.W.2d 207, 211-12 (Minn. App. 1995). A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted). When reviewing for clear error, appellate courts do not reweigh the evidence or resolve conflicting evidence. *Id.* at 221-22.

The district court found that "[c]ommitment for an indeterminate period of time to the [FMHP] as a person mentally ill and dangerous to the public is currently the least restrictive, available, and appropriate disposition." That determination is supported by the evidence. Dr. McKenna testified that, in her opinion, indeterminate commitment is the least restrictive alternative. She explained that Oyugi's psychiatric disorder has resulted in episodes of paranoia and delusional beliefs and increasingly erratic and violent behavior toward others. She testified that her biggest concern is Oyugi's escalation of violence and his lack of insight despite his history of receiving extensive services. She also testified that it is clear that he will discontinue services and medication at the first opportunity. Similarly, Dr. Jorgenson testified that she was unaware of any less restrictive alternative and that

treatment at AMRTC would be inappropriate for Oyugi given his history of noncompliance with treatment and the ineffectiveness of past short-term interventions. Dr. McKenna's and Dr. Jorgenson's testimony supports the district court's determinations that short-term treatment and return to the community would not be safe and that existing safeguards are insufficient to manage Oyugi's risk level.

The district court considered Oyugi's mother's testimony about AMRTC. It found her testimony sincere but less persuasive and weighty than Dr. McKenna's testimony. It also found Dr. Jorgenson's testimony to be highly persuasive. We will not disturb the district court's findings by reweighing the evidence or resolving conflicting evidence. *See id.*[4]

Oyugi also argues that, because a less restrictive alternative like AMRTC has not been tried, his commitment to FMHP is "tantamount to an unjustified institutional isolation of a person with a disability and is discriminatory," citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

Oyugi's reliance on *Olmstead* is misplaced. In *Olmstead*, the United States Supreme Court concluded that states "are required to provide community-based treatment for

---

[4] Oyugi makes other challenges to Dr. McKenna's opinion that a less restrictive alternative does not exist. He asserts that Dr. McKenna wrongly claimed he had already been treated at AMRTC. But there is no evidence in the record that Dr. McKenna made this claim. Oyugi also challenges Dr. McKenna's use of terms such as "at various times" and "on a number of occasions" to describe the frequency of his odd behavior—such as screaming in his cell and making comments about demons, etc.—which, he claims, is inconsistent with jail notes that only mention two occasions. Although there were only two entries about this particular behavior, the entries appear to indicate that the behavior happened more than twice.

persons with mental disabilities when the [s]tate's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated." 527 U.S. at 607. Here, the county's treatment professionals—Dr. Jorgenson and Dr. McKenna—determined that a less restrictive community-based treatment was not appropriate for Oyugi. Because the county's treatment professionals determined that a less restrictive community-based treatment was not appropriate, *Olmstead* does not apply.

III.    **The district court did not commit reversible error by admitting and considering certain hearsay evidence and expert witness testimony.**

Oyugi lastly makes two evidentiary arguments: (1) that the district court improperly relied on unreliable hearsay and (2) that the district court erred by admitting inadmissible expert testimony. We review the decision to admit evidence for an abuse of discretion. *In re Civ. Commitment of Spicer*, 853 N.W.2d 803, 813 (Minn. App. 2014). Even if evidence was wrongly admitted, we will not reverse unless the error was prejudicial. *See* Minn. R. Civ. P. 61 (requiring harmless error to be ignored); *In re Civ. Commitment of Turner*, 950 N.W.2d 303, 309 (Minn. App. 2020) (applying rule 61).

A.    **Hearsay Evidence**

Oyugi argues that, at both the initial commitment hearing and the indeterminate commitment hearing, the district court prejudicially erred by relying on unreliable hearsay evidence. We disagree.

Under the Minnesota Commitment and Treatment Act, at a commitment hearing, the district court "may admit all relevant, reliable evidence, including but not limited to the

respondent's medical records, without requiring foundation witnesses." Minn. Spec. R. Commit. & Treat. Act 15. Further, the Act provides that "[t]he court shall admit all relevant evidence at the hearing" and that "[t]he court shall make its determination upon the entire record pursuant to the Rules of Evidence." Minn. Stat. § 253B.08, subd. 7 (2022).

First, Oyugi argues that the warning label on the can of bear mace stating that bear mace can cause "irreversible physical eye damage" was unreliable hearsay that should not have been admitted into evidence at the initial commitment hearing without support from a medical expert witness. But, even if the bear mace label was unreliable hearsay, in its findings of fact and conclusions of law after the initial hearing, the district court did not reference the warning label or the statement about "irreversible physical eye damage." Even if there was an error in admitting this evidence, Oyugi has not demonstrated prejudice warranting reversal.

Second, Oyugi argues that the district court erred by relying on Dr. McKenna's opinion at the indeterminate commitment hearing because it was based on records containing unreliable hearsay. The district court did not abuse its discretion by relying on Dr. McKenna's opinion because she, as an expert, was allowed to review and rely on all of the county's proposed exhibits regardless of their potential admissibility. *See In re Civ. Commitment of Williams*, 735 N.W.2d 727, 733 (Minn. App. 2007), *rev. denied* (Minn. Sept. 26, 2007).

Third, Oyugi argues that the district court erred by admitting the police reports regarding the 2020 incident and taking judicial notice of the police reports regarding the 2023 incidents at the indeterminate commitment hearing because they contained unreliable

16

hearsay. He contends that the police reports detailing his assault on his sister in 2020 are unreliable because they conflict with his mother's testimony about how his sister had described the incident to her, which the mother understood to be a "pushing match." But Oyugi does not adequately explain why the conflict between the police reports and the testimony of a witness who did not observe the incident is a reason to doubt the reliability of the police reports.

Oyugi also contends that the police reports regarding the 2020 incident are unreliable because they used words like "'bashed' and 'slammed' to exaggerate the seriousness of the conduct" that resulted in no injury to the sister, and they were inconsistent because one officer said the sister hit her head on the floor, another officer said the sister hit her head on the wall, and another officer stated that Oyugi "pushed" the sister. Similarly, Oyugi asserts that the police reports about the April 21, 2023 incident were unreliable because some officers used the term "aerosol" and others used "bear mace." But these word choices and differences in the reports are negligible and do not provide a basis to conclude that the district court abused its discretion by admitting them.[5]

### B. Expert Witness Testimony

Oyugi argues that Dr. Jorgenson's testimony at the initial commitment hearing as to whether an action or substance was capable of causing "serious physical injury" "amounted

---

[5] Oyugi also appears to challenge, as an evidentiary matter, the county's characterization during its closing argument of how he held a bat during one of the incidents. It is unclear how Oyugi is challenging the county's argument as inadmissible evidence. In any event, the district court did not mention the county's characterization in its findings of fact and conclusions of law and thus Oyugi has again failed to show how he was prejudiced by any error. *See* Minn. R. Civ. P. 61.

to unfounded expert testimony" that should have been excluded under Minnesota Rule of Evidence 702. But the district court did not cite this particular testimony by Dr. Jorgenson in its findings of fact or conclusions of law after the initial hearing, and Oyugi has failed to demonstrate how he was prejudiced by any error. *See id.*

We discern no reversible error in the district court's evidentiary decisions.

**Affirmed.**