*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1004**

In the Matter of the Civil Commitment of: Elakie Fale.

**Filed November 3, 2025**
**Affirmed**
**Larkin, Judge**

Benton County District Court
File No. 05-PR-23-1107

Rosalind R. Sullivan, Sullivan Law, PLLC, Minneapolis, Minnesota (for appellant Elakie Fale)

Kathleen L. Reuter, Benton County Attorney, William V. Faerber, Assistant County Attorney, Foley, Minnesota (for respondent county)

Considered and decided by Bond, Presiding Judge; Ross, Judge; and Larkin, Judge.

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant challenges his indeterminate civil commitment as a person who has a mental illness and is dangerous to the public. We affirm.

**FACTS**

In July 2023, Benton County Human Services petitioned for civil commitment of appellant Elakie Fale as a person who has a mental illness and is dangerous to the public (MI&D). In January 2024, the district court held a trial on the county's petition and subsequently determined that Fale met the standard for commitment as MI&D. The district court ordered Fale's initial commitment as MI&D and his transfer from St. Cloud Hospital

to the Benton County Jail until a bed became available at the Minnesota Security Hospital at St. Peter (St. Peter), where he would be placed for further assessment and treatment.

In April 2024, Fale appealed to this court. He challenged the district court's determination that he engaged in overt acts capable of causing or attempting to cause serious physical harm to another, and he argued that the district court erred by not considering less-restrictive treatment alternatives. In September 2024, we affirmed the district court's determination of serious physical harm, but we concluded that a decision regarding the least-restrictive treatment alternative was premature because the district court had not yet determined whether Fale's commitment should be indeterminate. *In re Civ. Commitment of Fale*, No. A24-0568, 2024 WL 4112958, at \*5 (Minn. App. Sept. 9, 2024). Fale remained in the Benton County Jail from February 2024 to November 2024, when he was moved to St. Peter for further assessment and treatment.

After Fale's first appeal and his placement at St. Peter, the district court held a review hearing. Neither party called any witnesses. The only new evidence presented was an updated psychological evaluation prepared by Dr. Christina Haldaman. The district court found that Fale continued to meet the standard for commitment as MI&D, and the court indeterminately committed Fale as such.

Fale appeals.

## DECISION

The district court may commit a person as MI&D if the person:

> (1) . . . has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity

2

to recognize reality, or to reason or understand, and is manifested by instances of grossly disturbed behavior or faulty perceptions; and

(2) . . . as a result of that impairment presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

Minn. Stat. § 253B.02, subd. 17 (2024).

"Dangerousness may be demonstrated by past conduct together with a determination the person is likely to engage in future violent conduct." *In re Lufsky*, 388 N.W.2d 763, 766 (Minn. App. 1986). The district court may consider the person's entire history in determining whether he poses a danger to others. *In re Welfare of Hofmaster*, 434 N.W.2d 279, 281 (Minn. App. 1989). A criminal conviction is not a prerequisite to commitment as MI&D. *In re Jasmer*, 447 N.W.2d 192, 195 (Minn. 1989). If the district court finds clear and convincing evidence that the person is MI&D, the district court shall commit the person to a treatment facility or program. Minn. Stat. § 253B.18, subd.1(a) (2024).

After a person is initially committed as MI&D, "[a] written treatment report shall be filed by the treatment facility or state-operated treatment program with the committing court within 60 days after commitment," and "[t]he court shall hold a hearing to make a final determination as to whether the patient should remain committed as a person who has a mental illness and is dangerous to the public." Minn. Stat. § 253B.18, subd. 2 (2024); *In re Malm*, 375 N.W.2d 888, 890 (Minn. App. 1985). At the review hearing, "the court may consider the findings of fact made following the original commitment hearing, and other

3

competent evidence relevant to respondent's present need for continued commitment." *Malm*, 375 N.W.2d at 891 (quotation omitted). "Where the patient is symptom-free while hospitalized and receiving medication, the court may consider precommitment dangerous behavior." *In re Dirks*, 530 N.W.2d 207, 211 (Minn. App. 1995) (citing *Malm*, 375 N.W.2d at 891). If the district court finds that "the patient continues to be a person who has a mental illness and is dangerous to the public, then the court shall order commitment of the proposed patient for an indeterminate period of time." Minn. Stat. § 253B.18, subd. 3 (2024); *Malm*, 375 N.W.2d at 890.

We review the district court's commitment decision to determine whether the court complied with statutory requirements and whether evidence in the record supports the court's findings of fact. *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). We review the court's findings of fact for clear error, viewing the record in the light most favorable to the district court's decision. *Id.* "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted). "We review de novo whether there is clear and convincing evidence in the record to support the district court's conclusion that appellant meets the standards for commitment." *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003).

4

# I.

Fale contends that the district court erred in concluding that he continues to meet the statutory definition of a "dangerous" person under Minn. Stat. § 253B.02, subd. 17.

In concluding that Fale continued to meet the standard for commitment as MI&D, the district court relied on Dr. Haldaman's 60-day psychological report. That report documented Fale's mental-health and treatment history, going back to approximately 2012. The report described Fale's disregard for his long-standing history of mental-health issues, his continued denial that he is mentally ill, and his prior refusal to comply with prescribed medications. The report explained that Fale "denied a history of inpatient or outpatient psychiatric treatment" and "denied the need for treatment or medication related to a psychological condition." Additionally, the report noted that Fale "consistently stated [that] he was informed 'over the last two years' that he was not mentally ill, did not require medication, and did not require treatment related to a mental illness."

Dr. Haldaman opined that Fale continued to meet the statutory requirements for designation as a person who is mentally ill and diagnosed Fale with delusional disorder, methamphetamine-use disorder, and cannabis-use disorder. The report noted that although Fale currently presented as relatively psychiatrically stable without psychiatric medication, he continued to have delusional beliefs. And although those delusional beliefs did not appear to be impacting Fale's daily functioning, Dr. Haldaman identified several factors that may worsen Fale's prognosis, such as Fale's history of mental-health issues, his poor insight into his need for treatment, and his extensive history of alcohol and controlled-substance use.

Dr. Haldaman also opined that Fale continued to be a danger to others and that his risk for violent reoffense remained elevated, reasoning that his mental-health symptoms have historically resulted in violent and aggressive behaviors. The record establishes that in May 2021, Fale was charged with first-degree burglary and two counts of possession of a firearm by an ineligible person. Fale was found incompetent to proceed to trial. In May 2022, Fale was charged with two counts of second-degree assault with a dangerous weapon after he allegedly pushed the victim twice and stabbed him in the back. In February 2023, Fale was again charged with second-degree assault with a dangerous weapon for allegedly using a knife to threaten a hotel employee. Three months later, Fale was found incompetent to proceed on all pending criminal charges. And in June 2023, Fale was charged with making threats of violence and two counts of fifth-degree assault; the alleged victims were a nurse and a psychiatrist at St. Cloud Hospital's Behavioral Unit. Dr. Haldaman concluded that Fale's "present prognosis for sustaining psychiatric stability . . . free of violent behaviors is *poor* absent sufficient oversight."

Dr. Haldaman's report supports the district court's determination that Fale continued to meet the statutory definition of a "dangerous person" who was substantially likely to engage in acts capable of inflicting serious physical harm to another if not hospitalized in a secure setting.

Fale argues that the district court's reliance on his past conduct was improper because he did not exhibit aggressive or delusional behavior and was compliant with recommended medication while he was housed in the Benton County Jail for nine months

6

prior to his transfer to St. Peter. Fale argues that the district court should have assessed his level of dangerousness based on his current state, and not on his past conduct.

In *Malm*, we rejected an argument that because Malm was "presently symptom-free he must be discharged." 375 N.W.2d at 891. Malm had a history of medication noncompliance, followed by a return to alcohol use and a reoccurrence of mental-health symptoms. *Id.* When Malm was medication compliant and abstained from alcohol use, his symptoms would go into remission; but if Malm failed to take his medications, or consumed alcohol, he would "almost certainly experience a recurrence of his symptoms." *Id.* In *Malm*, we recognized that because "a patient may become symptom-free during hospitalization" it is appropriate to consider precommitment behavior when reviewing an order for indeterminate commitment. *Id.*

The circumstances here are similar to those in *Malm*. The record clearly and convincingly shows that Fale has a history of refusing prescribed psychiatric medications, returning to substance use, experiencing a recurrence of mental-health issues, and engaging in behaviors that are dangerous to others. At the commitment trial, one of Fale's doctors stated that Fale probably had at least 15 hospitalizations since 2015, "all of them the very same nature, off medications, typically substance use, paranoia, and concerns about dangerousness." Additionally, the district court found that Fale "has a long significant history of taking himself off medication and using street drugs" and that when Fale "is not medication compliant, his delusions become pervasive, and he acts on his delusions. When acting on his delusions, [Fale] is dangerous."

7

We recognize that, since his initial commitment, Fale has not engaged in new or recent overt acts that would further support a finding of dangerousness, but such acts are not required. Fale's *entire* history is considered when determining whether he remained a danger as a result of his mental illness. *See Hofmaster*, 434 N.W.2d at 281. And that history clearly and convincingly supports the district court's conclusion that Fale presents a clear danger to the safety of others as a result of his mental illness.

**II.**

Fale contends that the district court erred in finding that there is a substantial likelihood he will engage in conduct capable of causing serious physical harm.

Again, at the review hearing, the only new evidence presented to the district court was Dr. Haldaman's 60-day report. That report described Fale's mental-health history going back to 2012 and described Fale's past violent conduct, including the May 2022 assault, his assault of a behavioral-health-unit nurse, and his assault of a psychiatrist in the behavioral-health unit. The report described Fale's lack of insight into his mental illness, his consistent denial of the need for medication or treatment related to his mental-health symptomatology, and his history of substance abuse.

Fale argues that he does not lack insight into his mental-health issues and that his unwillingness to discuss his criminal actions were an exercise of his Fifth Amendment right against self-incrimination. Fale's long history of denying his mental illness is well documented in the record. Dr. Haldaman's report noted that "several factors are apparent that may worsen [Fale's] prognosis, most prominent of which are his poor insight into the need for treatment and his history of psychotic symptomatology and his limited insight

into" that symptomology. Additionally, Dr. Haldaman's report noted that, given Fale's "history of violence, substance use, and limited insight into the same, he does represent a danger to others and would benefit from mental-health and chemical dependency treatment and supervision." In sum, determinations regarding Fale's lack of insight are clearly and convincingly supported by his documented mental-health history, regardless of his choice to refrain from discussing any pending criminal charges.

Fale also argues that he did not have delusional beliefs while he was housed in Benton County Jail for nine months prior to his transfer to St. Peter and that there were inconsistencies in Dr. Haldaman's reported findings that he did. But Fale's history of delusional beliefs was well documented at the commitment trial. At that trial, the district court received evidence that Fale's "working diagnoses" included "delusion disorder" and "paranoid delusional disorder at times with some grandiose delusions." There was also evidence that "all of [the] opinions from various physicians and psychologists who evaluated him have delusions as the core" and that Fale "has continued to express those delusional beliefs and act on those delusional beliefs," which has resulted in Fale harming people and not cooperating with treatment staff. Finally, Dr. Haldaman's report for the review hearing noted that Fale continued to "endorse[] a wide range of delusional beliefs throughout the course of the interview," "particularly when pressed about his past violent behaviors, findings of incompetency, and hospitalizations."

Fale next argues that the district court relied too heavily on his criminal history when determining his likelihood of future harm and instead should have relied on the time between the initial commitment and review hearing, when he did not display aggressive

9

behavior. There was a significant delay between the initial commitment hearing and the review hearing. But Fale was in a structured setting during that time, first at the Benton County Jail and then at St. Peter. Nonetheless, the district court could still consider Fale's pre-commitment behavior—when he was not in a structured setting—when assessing whether he still met the standard for commitment as MI&D at the time of the review hearing. *See Jasmer*, 447 N.W.2d at 195 (indicating that a court appropriately considers precommitment behavior in rendering a finding of dangerousness).

Finally, Fale argues that the district court relied too heavily on his history of medication noncompliance while giving no weight to his medication compliance within the past 15 months. But even if a patient has become medication compliant while placed in a court-ordered facility pursuant to a civil commitment, it is appropriate to consider precommitment behavior. *See Malm*, 375 N.W.2d at 891.

In sum, the district court did not err in finding that there exists a substantial likelihood that Fale will engage in conduct capable of causing serious physical harm.

**III.**

Fale contends that the district court failed to properly consider and determine the least-restrictive alternative for his care and treatment.

> If the court finds by clear and convincing evidence that the proposed patient is a person who has a mental illness and is dangerous to the public, it *shall* commit the person to a secure treatment facility or to a treatment facility or state-operated treatment program willing to accept the patient under commitment.

10

Minn. Stat. § 253B.18, subd. 1 (2024) (emphasis added). "The court *shall* commit the patient to a secure treatment facility unless the patient or others establish by clear and convincing evidence that a less restrictive state-operated treatment program or treatment facility is available that is consistent with the patient's treatment needs and the requirements of public safety." *Id.* (emphasis added). The district court's decision regarding the least-restrictive treatment alternative will not be reversed unless clearly erroneous. *Dirks*, 530 N.W.2d at 211-12.

Dr. Haldaman's report opined that long-term support and oversight are necessary to meet Fale's treatment and supervision needs while ensuring public safety. Dr. Haldaman specifically noted that to "manage [Fale's] mental illness and mitigate his violence risk," it was "imperative that the setting offer ongoing monitoring of his mental status, medication compliance, and abstinence from mood-altering substances, and have the ability to quickly respond to relapse." Dr. Haldaman recommended continued treatment at St. Peter, noting that Fale may benefit from the structure and oversight the program provides while allowing for "gradual increases in liberty, transition to a less-secure facility and, ultimately, supported and monitored community reintegration." Dr. Haldaman opined that no less-restrictive setting would safeguard the public while meeting Fale's treatment and supervision needs. The district court credited Dr. Haldaman's opinion, noting that it was supported by expert testimony at the initial commitment hearing.

The record reflects, and the parties agree, that the only treatment facility that will admit a person found to be MI&D is St. Peter. Because Fale continued to meet the criteria for commitment as MI&D at the review hearing, the St. Peter program was the *only* viable

option. Fale argues that, because there is no treatment option other than St. Peter for patients committed as MI&D, the statutory right to present a less-restrictive alternative is illusory. Even if Fale has identified a problem, as an error-correcting court, we cannot provide a remedy. Fale does not argue that the statutory less-restrictive-alternative requirement is ambiguous or indicates a legislative intent to forgo placement of a MI&D patient at a secure facility in the absence of a less-restrictive alternative. When statutory language is unambiguous, we enforce it as written. *See Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 169 (Minn. 2021) ("When a statute is unambiguous, our role is to enforce the language of the statute and not explore the spirit or purpose of the law." (quotation omitted)). Nor does Fale identify a constitutional basis to reject the clear statutory language mandating his placement in a secure facility based on his commitment as MI&D.

In sum, the district court did not err in considering and determining the least-restrictive alternative for Fale's care and treatment.

## IV.

Fale contends that the district court erred by ordering an indeterminate commitment under the MI&D standard when a less-restrictive form of civil commitment was appropriate.

As set forth in the relevant statute, after the review hearing:

> If the court finds that the patient should be committed as a person who poses a risk of harm due to mental illness, but not as a person who has a mental illness and is dangerous to the public, the court may commit the patient as a person who poses a risk of harm due to mental illness and the court shall deem the patient not to be dangerous to the public . . . .

12

Minn. Stat. § 253B.18, subd. 2(c) (2024). Fale essentially argues that the court could have opted to commit Fale without a finding of dangerousness, which would have resulted in periodic review and more flexible treatment options.

We have concluded that the district court did not err by determining that Fale met the standard for commitment as MI&D. The legislature has clearly provided that "[a]fter a final determination that a patient is a person who has a mental illness and is dangerous to the public, the patient *shall be transferred, provisionally discharged or discharged, only as provided in this section*," which governs "[p]ersons who are mentally ill and dangerous to the public." Minn. Stat. § 253B.18, subd. 3 (emphasis added). We therefore question Fale's suggestion that the district court was authorized to order a lesser form of civil commitment despite its finding that Fale met the criteria for commitment as MI&D. Fale does not cite authority supporting that proposition, and that approach would be inconsistent with clear statutory directives. *See id.* We therefore reject Fale's argument on this issue.

In sum, because the district court correctly found that Fale continued to meet the criteria for commitment as MI&D, his indeterminate commitment as MI&D was statutorily required.

## V.

Fale contends that the MI&D statutory commitment scheme violates the United States and Minnesota Constitutions.

Minnesota statutes are presumed to be constitutional, and a court's power to declare a statute unconstitutional "should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). A party

challenging the constitutionality of a statute bears the burden of demonstrating that the statute is unconstitutional. *State v. Clausen*, 493 N.W.2d 113, 115 (Minn. 1992).

Fale argues that the statutory standards for commitment as MI&D are unconstitutionally vague, lack procedural safeguards, and violate equal protection. However, none of those issues was raised before or decided by the district court.[1] Generally, we do not address issues that were not addressed and determined by the district court, including constitutional issues. *Thiele*, 425 N.W.2d at 582-83; *see Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996) (stating that appellate courts generally will not decide issues which were not raised before the district court, including issues of constitutional law). We are not persuaded to depart from that general practice in this case and therefore do not address the constitutional arguments raised for the first time on appeal.

**Affirmed.**

---

[1] In addition, some of Fale's constitutional arguments rely on documents that we cannot consider. *See* Minn. R. Civ. App. P. 110.01 (stating that the record on appeal is limited to the exhibits, transcripts, and documents filed in the district court); *see also Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that "[a]n appellate court may not base its decision on matters outside the record on appeal, and may not consider matters not produced and received in evidence below").